**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION AT CLEVELAND**

| | | |
|---|---|---|
| IN RE: SONIC CORP. CUSTOMER | § | MDL Case No. 1:17-md-02807-JSG |
| DATA BREACH LITIGATION | § | |
| | § | JUDGE JAMES S. GWIN |
| THIS DOCUMENT RELATES TO: | § | |
| ALL CASES | § | |

**PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs, identified below (collectively "Plaintiffs"), individually and on behalf of the

Classes defined below of similarly situated persons, allege the following against Sonic Corp.;

Sonic Franchising, LLC; Sonic Industries, LLC; Sonic Industries Services, Inc.; Sonic Restaurants,

Inc.; and John Does 1 – 3,365 (collectively, "Sonic" or "Defendants") based upon personal

knowledge with respect to themselves and on information and belief derived from, among other

things, investigation of counsel and review of public documents as to all other matters:

**JURISDICTION AND VENUE**

1.      This Consolidated Complaint is intended to serve as a superseding complaint as to

all other complaints that have been consolidated in this multidistrict litigation.  As set forth herein,

this Court has general jurisdiction over Defendants and original jurisdiction over Plaintiffs' claims.

2.      This Court has subject matter jurisdiction over this action under the Class Action

Fairness Act, 28 U.S.C. § 1332(d)(2).  The amount in controversy exceeds $5 million exclusive of

interest and costs.  At least one Plaintiff and one Defendant are citizens of different states.  There

are more than 100 putative class members.

3.      This Court has personal jurisdiction over Defendants because they regularly

conduct business in Ohio and have sufficient minimum contacts in Ohio.  Defendants intentionally

avail themselves of this jurisdiction by marketing and selling products and services in Ohio.

4.      Venue is proper in this Court pursuant to the United States Judicial Panel on Multidistrict Litigation's December 6, 2017 Transfer Order, MDL Case No. 2807, Dkt. No. 36.

**THE DATA BREACH**

5.      On September 26, 2017, the cyber security blog, Krebs on Security, broke the news that a data breach at Sonic had exposed millions of credit and debit cards ("payment cards") used at Sonic and that the stolen information was being sold on "shadowy underground cybercrime stores."  *See* "Breach at Sonic Drive-In may have impacted millions of credit, debit cards," Krebs on Security, 09/26/17, at https://krebsonsecurity.com/2017/09/breach-at-sonic-drive-in-may-have-impacted-millions-of-credit-debit-cards/.  By the following day, the story had been picked up by major new outlets.

6.      According to Sonic's public statements, it was made aware of "unusual activity" on payment cards used at Sonic by its payment card processor the week before.  *See, e.g.* "Sonic Drive-In hit by security breach" USA Today, 09/27/17, at https://www.usatoday.com/story/tech/2017/09/27/sonic-drive-hit-security-breach/708850001/.

7.      Sonic did not acknowledge that a data breach had occurred until October 4, 2017 and then only in statement on its corporate website.  *See* "Sonic Drive-in: Notice of Payment Card Breach," 10/04/17, at http://ir.sonicdrivein.com/releasedetail.cfm?releaseid=1042818.  Even then, despite the fact that information on payment cards recently used at Sonic were being openly sold on the black market, Sonic only stated that "credit and debit card numbers *may* have been acquired without authorization."  *Id.* (emphasis added).  Confusing the matter further, Sonic indicated that the theft of customers' data may have only occurred at "certain Sonic Drive-In locations" but provided *no* information about which locations were affected.  *Id.*

8.     Sonic has made no further statement regarding how the hackers got into its systems, what data they took, what locations were affected, etc.  Further, Sonic has made no effort to notify the individuals whose data was stolen, leaving consumers to guess as to whether they are impacted and need to take measures to protect themselves from fraud.  Indeed, for most customers, the first indication they had that they were impacted by the Sonic breach was seeing a fraudulent charge to their account.

9.     Despite warnings from its payment card processor, First Data[1], and a number of high profile data breaches at other restaurant chains[2] putting Sonic on notice of the need to be vigilant against and take steps to prevent data breaches, Sonic's management maintained a lackadaisical attitude towards data security in the years and months leading up to the breach.

10.    Sonic continued operating an antiquated, thirty year old, point-of-sale ("POS") system, OrderMatic, until approximately 2014, when it began the process of upgrading to a more modern system based on the Micros Oracle platform.  *See* "Sonic Investing in POS Technology," Burger Business, 03/25/14, at http://burgerbusiness.com/sonic-investing-in-pos-technology/.  The Micros system was fraught with problems and the implementation process was slow.

11.    Sonic finally formed a team to roll out the new system at its corporate- and franchisee-owned stores in 2016.  *See* "Sonic team helps operators reap benefits of new POS system," Nation's Restaurant News, 04/14/17, at http://www.nrn.com/technology/sonic-team-helps-operators-reap-benefits-new-pos-system.  As of April 2017, only about 77% of Sonic's

---

[1] In a pamphlet, First Data warns:  "***Data is extremely vulnerable and you are completely responsible for protecting it***."  "Payment Card Data Breaches:  What You Need to Know About Your Risk and Liability," First Data Market Insight, at https://www.firstdata.com/downloads/thought-leadership/13405_0714_Payment_Card_Data_Breach.pdf

[2] *See e.g.* "7 Way to Protect Against a Data Breach," QSR Magazine, Feb. 2016, at https://www.qsrmagazine.com/restaurant-software/7-ways-protect-against-data-breach.

restaurant locations had made the change to the new system. *Id.* The remaining locations continued operating OrderMatic or were using an alternate POS systems by Infor.

12. Notwithstanding the warnings and pleas of many of its employees who recognized the vulnerability of millions of customers' sensitive information stored in Sonic's systems, Sonic management refused, for years, to upgrade its security systems, refused to follow recommendations of information technology ("IT") employees and experts, and suffered from ineffective or self-interested leadership in key IT security positions within the organization.

13. Sonic customers across the United States have suffered real and imminent harm as a direct consequence of Sonic's conduct, which includes (a) refusing to take adequate and reasonable measures to ensure its data systems were protected; (b) refusing to take available steps to prevent the breach from happening; (c) failing to disclose to its customers the material fact that it did not have adequate computer systems and security practices to safeguard customers' personal and financial information; and (d) failing to provide timely and adequate notice of the data breach.

14. As a result of the data breach, the personal information, which included, but may not be limited to, payment card data ("PCD"), of 5 million Sonic customers has been exposed to criminals for misuse.

15. Remarkably, Sonic would not have even discovered the breach when it did except for its payment processor notifying it of "unusual activity" on payment cards after they had been used at Sonic and an Internet blog post by a data security watchdog that reported that massive batches of Sonic customers' payment cards have been offered for sale on online black markets to be purchased by criminals across the globe.

16. The injuries suffered by Plaintiffs and the proposed Classes as a direct result of the data breach include, *inter alia*:

a.   Unauthorized charges on their payment card accounts;

b.   Theft of their personal and financial information;

c.   Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

d.   Loss of use of and access to their account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit including decreased credit scores and adverse credit notations;

e.   Costs associated with time spent and the loss of productivity from taking time to address and attempting to ameliorate, mitigate, and deal with the actual and future consequences of the data breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with all issues resulting from the data breach;

f.   The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their personal information and PCD being placed in the hands of criminals and already misused via the sale of Plaintiffs' and Class members' information on the Internet black market;

g.   Damages to and diminution in value of their personal and financial information entrusted to Sonic for the sole purpose of making purchases at Sonic and with the

mutual understanding that Sonic would safeguard Plaintiffs' and Class members' data against theft and not allow access to and misuse of their information by others;

h. Money paid to Sonic stores during the period of the data breach in that Plaintiffs and Class members would not have gone to Sonic had Sonic disclosed that it lacked adequate systems and procedures to reasonably safeguard customers' personal information and PCD and had Sonic provided timely and accurate notice of the data breach;

i. Continued risk to their personal information and PCD, which remains in the possession of Sonic and which is subject to further breaches so long as Sonic continues to fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class members' data in its possession.

17. Examples of the harms to Sonic customers as a direct and foreseeable consequence of Sonic's conduct include the experiences of the representative Plaintiffs, which are described below.

**PARTIES**

18. Plaintiff Septabeya Bean is a resident of Tupelo, Mississippi. She is (and was during the period of the data breach) a citizen of the State of Mississippi. She shopped at Sonic in Baldwyn, Mississippi several times per week in 2017 and each time she paid with her debit card through one of Sonic's point-of-sale devices. On or about September 25, 2017, Plaintiff Bean discovered a fraudulent charge of approximately $500 to the account linked to the debit card she used at Sonic. Since that time, she has found other, smaller fraudulent charges, bringing the total of fraudulent charges to Plaintiff Bean's accounts to $587.00. Although she has disputed the charges, the bank has not returned this money to her. Eventually, the continued fraud forced

Plaintiff Bean to close her accounts.  To date, Plaintiff Bean has spent over 100 hours dealing with the fraud and the problems are still unresolved.  In fact, dealing with the issues resulting from the data breach caused her to miss 40 hours of work as an industrial engineer where she earns $10.20 per hour.  As a result, Plaintiff Bean has suffered lost income in the amount of $408.00.  Plaintiff Bean never received any individual notification from Sonic regarding the breach or the free credit monitoring offered by Sonic.

19.     Plaintiff Cornelius Bogard is a resident of Cleveland, Ohio.  He is (and was during the period of the data breach) a citizen of the State of Ohio.  He shopped at Sonic in Parma, Ohio approximately twelve (12) times in 2017 and each time he paid with his debit card through one of Sonic's point-of-sale devices.  On or about November 4, 2017, Plaintiff Bogard discovered fraudulent charges to his account totaling $29.00.  He immediately notified his bank, disputed the charges, and cancelled the debit card.  Plaintiff Bogard has spent about seventy-two (72) hours addressing issues arising from the breach.  In fact, dealing with the issues resulting from the data breach caused him to miss 20 hours of work as a plumber where he earns $85 per hour.  As a result, Plaintiff Bogard has suffered lost income in the amount of $1,700.00.  Plaintiff Bogard never received any individual notification from Sonic regarding the breach or the free credit monitoring offered by Sonic.

20.     Plaintiff John Stephen Dolembo is a resident of Las Vegas, Nevada.  He is (and was during the period of the data breach) a citizen of the State of Nevada.  He shopped at a Sonic location in the Las Vegas area in August of 2017 and paid with his debit card through one of Sonic's point-of-sale devices.  As a result of the data breach, Plaintiff Dolembo was at risk of imminent risk and decided to cancel his debit card to prevent criminals from being able to use the payment card data stolen in the Sonic data breach to access his financial accounts.  He spent

approximately one hour dealing with his financial institution to prevent fraud from the data breach. He was also inconvenienced by having to wait for a new card to arrive to access his account. Plaintiff Dolembo never received any individual notification from Sonic regarding the breach or the free credit monitoring offered by Sonic.

21.     Plaintiff Caitlin Gilmore is a resident of Aubrey, Texas.  She is (and was during the period of the data breach) a citizen of the State of Texas.  She shopped at Sonic locations in Aubrey, Texas and Frisco, Texas a few times per month in 2017 and paid with her debit card through one of Sonic's point-of-sale devices.  On or about September 27, 2017, Plaintiff Gilmore went to lunch with her co-workers and her debit card was, embarrassingly, declined.  She then checked her account and discovered that thieves had drained the account linked to the debit card she used at Sonic.  Plaintiff Gilmore disputed the charges but it took the bank approximately ten (10) days to return the funds.  While waiting on the bank to investigate and replenish her account, Plaintiff Gilmore was completely without funds and unable to pay for necessities for herself and her minor child, which caused her worry, stress and embarrassment as she had to borrow money from friends. Plaintiff Gilmore has spent approximately five (5) hours dealing with the fraud.  Plaintiff Gilmore never received any individual notification from Sonic regarding the breach or the free credit monitoring offered by Sonic.  In accordance with the Texas Deceptive Trade Practices Act-Consumer Protection Act V.T.C.A. Business and Commerce Code, Section 17.41, *et seq.*, Plaintiff Gilmore, through counsel, sent a demand letter to Sonic on or about October 6, 2017.  Sonic did not respond.

22.     Plaintiff Clara Hughes-Hillman is a resident of Chicago, Illinois.  She is (and was during the period of the data breach) a citizen of the State of Illinois.  She shopped at Sonic locations in Cicero, Illinois and Franklin Park, Illinois several times in August and September of

2016 and each time she paid with her debit card through one of Sonic's point-of-sale devices.  Not long thereafter, Plaintiff Hughes-Hillman discovered fraudulent charges with online retailers.  She immediately notified her bank, disputed the charges, and cancelled the debit card.  While Plaintiff Hughes-Hillman was, eventually, able to get the fraudulent charges refunded, the lack of access to those funds in the interim caused her to be unable to pay a phone bill and incur a late fee.  She has spent several hours addressing issues arising from the breach.  Plaintiff Hughes-Hillman never received any individual notification from Sonic regarding the breach or the free credit monitoring offered by Sonic.

23.     Plaintiff Jeffrey Lewin is a resident of Parkland, Florida.  He is (and was during the period of the data breach) a citizen of the State of Florida.  He shopped at Sonic in Lauderhill, Florida twice in the summer of 2017 and each time he paid with his credit card through one of Sonic's point-of-sale devices.  In September of 2017, Plaintiff Lewin was contacted by his credit card company, American Express, about an attempted charge at a Best Buy in Georgia.  He confirmed that *he* was not the one attempting to use the card and the charge was rejected.  Damages to Plaintiff Lewin in the form of fraudulent charges are certainly impending and, since being notified of one attempted fraudulent charge, Plaintiff Lewin has devoted extra time to reviewing charges to his account to look for any fraudulent charges that may have been made to his account.  He never received any individual notification from Sonic regarding the breach or the free credit monitoring offered by Sonic.

24.     Plaintiff Megan MacKay is a resident of Surprise, Arizona.  She is (and was during the period of the data breach) a citizen of the State of Arizona.  She shopped at various Sonic locations in the Phoenix area approximately half a dozen times in 2017 and paid, each time, with her debit card.  On September 20, 2017, Plaintiff MacKay's debit card information was used to

make charges totaling $69.29 without her permission, in Pasadena, California.  These fraudulent charges depleted her bank account.  Plaintiff MacKay reported the fraudulent charges to her bank and they informed her that her information had been compromised due to the Sonic Data Breach. After about two weeks, the bank refunded the fraudulent charges to her account.  However, the inability to access and use her money in the interim caused some charges to be rejected causing Plaintiff MacKay embarrassment, stress and worry. Furthermore, as a result of being unable to access and use her funds while the fraud was being investigated by her bank, she had to charge purchases and bills to her credit card, which caused her to incur credit card fees. Plaintiff MacKay spent approximately ten (10) hours dealing with her bank to resolve the fraudulent charges, trying to trace back where the charge came from, and checking her credit and account statements for other fraudulent activity.  Plaintiff MacKay continues to have to spend extra time reviewing her account statements for other fraudulent charges.  She never received any individual notification from Sonic regarding the breach or the free credit monitoring offered by Sonic.

25.     Plaintiff Dometric Pearson is a resident of Grand Prairie, Texas.  She is (and was during the period of the data breach) a citizen of the State of Texas.  She shopped at Sonic locations in Grand Prairie, Texas once or twice a week in 2017 and paid with a credit card.  On October 13, 2017, Plaintiff Pearson received an email notification from her bank that her credit card had been compromised in the Sonic data breach and that, as a result, the card was being cancelled and a new card was being issued.  Plaintiff Pearson never received a replacement card and continues to be deprived of access to her credit and to spend time dealing with the bank to try to resolve issues resulting from her card being compromised in the data breach.  In accordance with the Texas Deceptive Trade Practices Act-Consumer Protection Act V.T.C.A. Business and Commerce Code, Section 17.41, *et seq.*, Plaintiff Pearson, through counsel, sent a demand letter to Sonic on or about

November 3, 2017.  Sonic did not respond.  She never received any individual notification from Sonic regarding the breach or the free credit monitoring offered by Sonic.

26.     Plaintiff Denise Ramirez is a resident of Albuquerque, New Mexico.  She is (and was during the period of the data breach) a citizen of the State of New Mexico.  She shopped at various Sonic locations in the Albuquerque area approximately a dozen times in 2017 and paid with her debit card.  On April 3, 2017, Plaintiff Ramirez discovered that several unauthorized charges, totaling over $1,000, were made to the account linked to the debit card she used at Sonic.  She contacted the bank to freeze the account and cancel the debit card.  It took the bank approximately two weeks to investigate and return the funds.  However, the lack of funds in the interim caused Plaintiff Ramirez's mortgage payment to bounce, which led to additional charges of $36.50.  Plaintiff Ramirez and/or her husband have spent, to date, approximately six (6) hours dealing with her bank to resolve the fraudulent charges, trying to trace where the charge came from, and checking her credit and account statements for other fraudulent activity.  She never received any individual notification from Sonic regarding the breach or the free credit monitoring offered by Sonic.

27.     Plaintiffs would not have used their credit or debit cards to make purchases at Sonic —indeed, they would not have shopped at Sonic at all during the period of the data breach—had Sonic told them that it lacked adequate computer systems and data security practices to safeguard customers' personal and financial information from theft. Sonic also failed to provide Plaintiffs with timely and accurate notice of the data breach.

28.     Each of the Plaintiffs suffered actual injury from having his or her personal information and PCD compromised and/or stolen as a result of the data breach.

29.     Each of the Plaintiffs suffered actual injury and damages in paying money to and purchasing products from Sonic during the data breach that they would not have paid or purchased had Sonic disclosed that it lacked computer systems and data security practices adequate to safeguard customers' personal and financial information and had Sonic provided timely and accurate notice of the data breach.

30.     Each of the Plaintiffs suffered actual injury in the form of damages to and diminution in the value of his or her personal and financial identity information—a form of intangible property that each of the Plaintiffs entrusted to Sonic for the purpose of making purchases at Sonic and which was compromised in and as a result of the data breach.

31.     Each of the Plaintiffs suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft and misuse posed by his or her personal and financial information being placed in the hands of criminals who have already misused such information stolen in the data breach via sale of Plaintiffs' and Class members' personal and financial information on the Internet black market.

32.     Each of the Plaintiffs suffered actual injury in the form of time spent dealing with fraud resulting from the data breach and/or monitoring their accounts for fraud.

33.     Each of the Plaintiffs suffered actual injury in the form of fraudulent charges and the loss of use of funds while disputing such charges and, in some instances, additional damages resulting from such loss of use.

34.     Plaintiffs have a continuing interest in ensuring that their private information, which remains in the possession of Sonic, is protected and safeguarded from future breaches.

35.     None of the Plaintiffs who suffered a loss of use of their account funds, or who had restrictions placed on their accounts, as a result of the data breach was reimbursed for the loss of access to or restrictions placed upon their accounts and the resulting loss of use of their own funds.

36.     Defendant Sonic Corp. is a Delaware corporation with its headquarters and principal place of business in Oklahoma City, Oklahoma.

37.     Sonic Franchising, LLC is a Delaware limited liability company with its headquarters and principal place of business in Oklahoma City, Oklahoma.  Sonic Franchising, LLC franchises restaurants.  It is a subsidiary of Sonic Corp.

38.     Sonic Industries, LLC is a Delaware limited liability company with its headquarters and principal place of business in Oklahoma City, Oklahoma.  Sonic Industries, LLC is a franchise assets holder.  It is a subsidiary of Sonic Corp.

39.     Sonic Industries Services, Inc. is an Oklahoma corporation with its headquarters and principal place of business in Oklahoma City, Oklahoma.  Sonic Industries Services, Inc. operates and franchises restaurants.  It is a subsidiary of Sonic Corp.

40.     Sonic Restaurants, Inc. is an Oklahoma corporation with its headquarters and principal place of business in Oklahoma City, Oklahoma.   Sonic Restaurants, Inc. operates restaurants.  It is a subsidiary of Sonic Corp.

41.     John Does 1 – 3,365 are Sonic franchisees whose customers were affected by the data breach.

## STATEMENT OF FACTS

42.    Sonic Corp., through its subsidiaries, operates and franchises the largest chain of drive-in restaurants ("Sonic Drive-Ins") in the United States. For the fiscal year ended August 31, 2017, Sonic generated $63.7 million in net income.  *See* Sonic Corp. Annual Report (Form 10-K), (filed 10/27/2017 with SEC).

43.    When Sonic refers to "Sonic Corp.," "Sonic," "the Company," "we," "us" and "our" in its SEC filings and annual reports, it is referring to Sonic Corp. and its subsidiaries. *Id.* As of August 31, 2017, the Sonic system was comprised of 3,593 drive-ins, of which 6% were Company Drive-Ins and 94% were Franchise Drive-Ins. *Id.*

44.    The typical Sonic Drive-In consists of a kitchen housed in a one-story building, which is approximately 1,500 square feet, flanked by canopy-covered rows of 16 to 24 parking spaces, with each space having its own payment terminal, intercom speaker system and menu board.  At a typical Sonic Drive-In, a customer drives into one of the parking spaces, orders through the intercom speaker system and has the food delivered by a carhop.  Many Sonic Drive-Ins also include a drive-thru lane and patio seating to provide customers with alternative dining options.

45.    In 2013, Sonic announced a new technology initiative to replace the company's 30 year old Point of Sale (POS) systems[3] with a single system based on a Micros Oracle platform.  In essence, as stated by Sonic's current Vice President, Restaurant Operational Systems, Matt Schein, Sonic "went from a rotary phone to a smartphone overnight."  "Sonic team helps operators reap benefits of new POS system," Nation's Restaurant News, 04/14/17, at http://www.nrn.com/technology/sonic-team-helps-operators-reap-benefits-new-pos-system.  As part of its technology initiatives, Sonic announced that it would implement a new digital point-of-

---

[3] Prior to Sonic's implementation of the Micros system, franchise stores were free to choose a different POS vendor than the one recommended by Sonic and, consequently, many stores operated alternate payment systems.

purchase technology and a new point-of-sale system "to drive improved sales and profits for [its] brand."  Sonic Corp. Current Report (Form 8-K), (filed 01/06/2014 with SEC).

46.    As of January 6, 2014, roughly 70 of Sonic's 391 company stores had been upgraded to the new Micros Point of Sale system.  "Sonic Rolls Out New POS and POPS Systems," Retail Insight, 01/16/14, at https://www.retailitinsights.com/doc/sonic-rolls-out-new-pos-and-pops-systems-0001. According to Sonic, the remainder of its company stores were scheduled to be upgraded by the summer of 2014 and all upgrades at Sonic's franchise stores would be completed by the end of the 2016 Fiscal year (August 31, 2016).  *Id.*

47.    In early 2016, more than two years after announcing that it would be upgrading and standardizing its POS systems, Sonic formed a three-member team, the Margin Improvement Management team, to train company store and franchise operators on how to use the new systems in order to help them drive sales and sales profitability, manage profit-and-loss statements and deploy technology to better organize inventory.  "Sonic team helps operators reap benefits of new POS system," Nation's Restaurant News, 04/14/17, at http://www.nrn.com/technology/sonic-team-helps-operators-reap-benefits-new-pos-system.

48.    As of April 14, 2017, only seventy-seven percent of Sonic's 3,593 locations had been updated to the digital point-of-purchase technology and the new point-of-sale system promised by Sonic.  *Id.*

49.    As set forth herein, all decisions relating to data security were made from Sonic's corporate headquarters in Oklahoma City, Oklahoma.

50.    In a debit or credit card purchase transaction, card data must flow through multiple systems and parties to be processed. Generally, the cardholder presents a credit or debit card to a retailer to pay for merchandise.  The card is then "swiped" and information about the card and the

purchase is stored in the retailer's computers and then transmitted to the acquirer or processor (i.e., the retailer's bank). The acquirer relays the transaction information to the payment card company, who then sends the information to the issuer (i.e., cardholder's bank).  The issuer then notifies the payment card company of its decision to authorize or reject the transaction.  See graphic below:



| | |
|---|---|
| 1 | The consumer selects a card for payment. The cardholder data is entered into the merchant's payment system, which could be the point-of-sale (POS) terminal/software or an e-commerce website. |
| 2 | The card data is sent to an acquirer/payment processor, whose job it is to route the data through the payments system for processing. With e-commerce transactions, a "gateway" provider may provide the link from the merchant's website to the acquirer. |
| 3 | The acquirer/processor sends the data to the payment brand (e.g. Visa, MasterCard, American Express, etc.) who forward it to the issuing bank/issussing bank processor |
| 4 | The issuing bank/processor verifies that the card is legitimate, not reported lost or stolen, and that the account has the appropriate amount of credit/funds available to pay for the transaction. |
| 5 | If so, the issuer generates an authorization number and routes this number back to the card brand. With the authorization, the issuing bank agrees to fund the purchase on the consumer's behalf. |
| 6 | The card brand forwards the authorization code back to the acquirer/processor. |
| 7 | The acquirer/processor sends the authorization code back to the merchant. |
| 8 | The merchant concludes the sale with the customer. |

Source:  "Payments 101:  Credit and Debit Card Payments," a white paper by First Data, at: https://www.firstdata.com/downloads/thought-leadership/payments101wp.pdf.

51.    There are two points in the payment process where sensitive cardholder data is at risk of being exposed or stolen: pre-authorization when the merchant has captured a consumer's data and it is waiting to be sent to the acquirer; and post-authorization when cardholder data has

been sent back to the merchant with the authorization response from the acquirer, and it is placed into some form of storage in the merchant's servers.

52.     Encryption mitigates security weaknesses that exist when cardholder data has been stored, but not yet authorized, by using algorithmic schemes to transform plain text information into a non-readable format called "ciphertext."  By scrambling the payment card data the moment it is swiped, hackers who steal the data are left with useless, unreadable text in the place of payment card numbers accompanying the cardholder's personal information.

53.     Sonic chose not to invest in the technology to encrypt payment card data at point-of-sale to make its customers' data more secure but, instead, focused its technology budget on new menu boards and other inventory control systems, which had more direct impact on the company's bottom line.

54.     John Does 1 – 3,365 refused to update to a more modern point-of-sale system that offered more protections against a data security breach; failed to install updates, patches, and malware protection or to install them in a timely manner to protect against a data security breach; and/or failed to provide sufficient control employee credentials and access to computer systems to prevent a security breach and/or theft of PCD.

55.     While Sonic purported to offer its customers a year of free credit monitoring after the data breach, the vast majority of Sonic's customers were not made aware of this offer because Sonic provided no notice to the customers affected by the data breach and information about how to sign up for the service was buried on Sonic's corporate website.  Further, Sonic only provided a very short time for customers to sign up for credit monitoring service – until December 31, 2017.

56.     In any event, credit monitoring is of no actual value to customers as a preventative measure because it is reactionary—it does nothing to prevent fraud in the first instance. As reported on Krebs:

> [Credit monitoring services] are basically PR vehicles for most of the breached companies who offer credit report monitoring to potentially compromised consumers… it does absolutely nothing to compensate for the fact that a criminal stole credit card mag stripe account… [Credit monitoring services] only give consumers limited help with a very small percentage of the crimes that can be inflicted on them… [a]nd consumers can get most of that limited help for free via the government website or free monitoring from a breached entity where their data inevitably was compromised.

"Are Credit Monitoring Services Worth It?" Krebs on Security, 03/19/14, at https://krebson security.com/2014/03/are-credit-monitoring-services-worth-it/comment-page-1/.

57.     As reported in the Chicago Tribune, retailers offering credit monitoring services and instructing their customers to check their credit reports in the wake of a data breach is "bad advice" because "[p]ayment card breaches have nothing to do with credit reports."  "Why credit monitoring will not help you after a data breach," Chicago Tribune, 08/15/14, at http://www.chicagotribune.com/business/chi-why-credit-monitoring-will-not-help-you-after-a-data-breach-20140815-story.html. As one security expert noted, offering credit monitoring "seems to be the knee-jerk reaction" after a breach but "makes no sense at all." Id.  The biggest concern is that credit monitoring offers customers a false sense of security but in reality offers little protection once the customer's personal information is exposed. Id.

58.     A study by the Identity Theft Resource Center show the multitude of harms caused by fraudulent use of personal information:



Source:   "Credit  Card  and  ID  Theft  Statistics"  by  Jason  Steele,  10/24/17,  at:

https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php.  Plaintiffs and the Class have experienced one or more of these harms as a result of the data breach.

59.     Sonic's offer of one year of credit monitoring to customer's whose personal information was exposed is also inadequate because it does not continue long enough.  There may be a time lag between when harm occurs versus when it is discovered, and also between when personal information or PCD is stolen and when it is used.  According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

"Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown" by GAO, June 2007, at: https://www.gao.gov/assets/270/262904.html.

60.     There is a strong probability that entire batches of stolen information have yet to be dumped on the black market, meaning Sonic customers could be at risk of fraud and identity theft for years into the future.

61.     Plaintiffs and members of the classes defined below have or will suffer actual injury as a direct result of Sonic's data breach.  In addition to fraudulent charges and damage to their credit, many victims spent substantial time and expense relating to:

   a.  Finding fraudulent charges;

   b.  Canceling and reissuing cards;

   c.  Purchasing credit monitoring and identity theft prevention;

   d.  Addressing their inability to withdraw funds linked to compromised accounts;

   e.  Removing withdrawal and purchase limits on compromised accounts;

   f.  Taking trips to banks and waiting in line to obtain funds held in limited accounts;

   g.  Spending time on the phone with or at the financial institution to dispute fraudulent charges;

   h.  Resetting automatic billing instructions; and

   i.  Paying late fees and declined payment fees imposed as a result of failed automatic payments.

62.     As a direct and proximate result of Sonic's conduct, Plaintiffs and the Class have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.  Plaintiffs now have to take the time and effort to mitigate the actual and potential impact of the data breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.  Moreover, Plaintiffs and the Class have an interest in ensuring that their information, which remains in the possession of Sonic is protected from further breaches by the implementation of security measures and safeguards.

63.     Plaintiffs and the Class have suffered, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a.    Trespass, damage to and theft of their personal property including personal information and PCD;

b.    Improper disclosure of their personal information and PCD property;

c.    The imminent and certainly impending injury flowing from potential fraud and identity theft posed by customers' personal information and PCD being placed in the hands of criminals and having been already misused via the sale of such information on the Internet black market;

d.    Damages flowing from Sonic's untimely and inadequate notification of the data breach;

e.    Loss of privacy suffered as a result of the data breach;

f.    Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the data breach;

g. Ascertainable losses in the form of deprivation of the value of customers' personal information for which there is a well-established and quantifiable national and international market; and

h. The loss of use of and access to their account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money customers were permitted to obtain from their accounts.

## CLASS ALLEGATIONS

### Statewide Classes

64. Pursuant to Fed. R. Civ. P. 23, Plaintiffs assert their claims that Sonic violated state consumer statutes (Count I) on behalf of separate statewide classes, defined as follows:

> **[Name of State] Consumer Protection Class:**
> All residents of [name of State] whose personal information was compromised as a result of the data breach first disclosed by Sonic in September 2017.

65. Plaintiffs assert the state consumer law claims (Count I) under the listed consumer protection laws of Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, and Wisconsin.

### State Common Law Classes

66. Pursuant to Fed. R. Civ. P. 23, and in the alternative to claims asserted on behalf of the Nationwide Class, Plaintiffs assert claims for negligence (Count III), negligence per se (Count IV), breach of implied contract (Count V), unjust enrichment (Count VI), and declaratory

judgment (Count VII) under the laws of the individual states of the United States, and on behalf of separate statewide classes, defined as follows:

> **[Name of State] [Negligence, Negligence Per Se, Breach of Implied Contract, Unjust Enrichment, or Declaratory Judgment] Class:**
> All residents of [name of State] whose personal information was compromised as a result of the data breach first disclosed by Sonic in September 2017.

67.     Plaintiffs assert the state common law claims (Counts III-VII) under the laws of Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin and Wyoming.

### Nationwide Class

68.     Pursuant to Fed. R. Civ. P. 23, Plaintiffs assert an alternative claim under the Consumer Protection Act of Oklahoma (Count II), and for common law claims for negligence (Count III), negligence per se (Count IV), breach of implied contract (Count V), unjust enrichment (Count VI), and declaratory judgment (Count VII) on behalf of a nationwide class, defined as follows:

> **Nationwide Class:**
> All residents of the United States whose personal information was compromised as a result of the data breach first disclosed by Sonic in September 2017.

69.     As alleged herein, Sonic is headquartered in Oklahoma City, Oklahoma, maintains its primary data center in Oklahoma, and the employees charged with making decisions concerning

data security are based in Oklahoma.  Sonic's conduct resulting in the data breach took place exclusively, or primarily, in Oklahoma.  Applying Oklahoma law, therefore, comports with due process.

70.     Excluded from each of the above Classes are Defendants and their parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded are any Judge to whom this case is assigned as well as his or her judicial staff and immediate family members.

71.     Each of the proposed classes meet the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3):

72.     **Numerosity.** The proposed classes include many thousands to millions of customers whose data was compromised in the data breach.  While the precise number of Class members in each proposed class has not yet been determined, the massive size of the Sonic data breach indicates that joinder of each member would be impracticable.

73.     **Commonality.** Common questions of law and fact exist and predominate over any questions affecting only individual Class members. The common questions include:

a.  Whether Sonic engaged in the conduct alleged herein;

b.  Whether Sonic's conduct constituted Deceptive Trade Practices (as defined below) actionable under the applicable consumer protection laws;

c.  Whether Sonic had a legal duty to adequately protect Plaintiffs' and Class members' personal information;

d.  Whether Sonic breached its legal duty by failing to adequately protect Plaintiffs' and Class members' personal information;

24

e.   Whether Sonic had a legal duty to provide timely and accurate notice of the data breach to Plaintiffs and Class members;

f.   Whether Sonic breached its duty to provide timely and accurate notice of the data breach to Plaintiffs and Class members;

g.   Whether and when Sonic knew or should have known that Plaintiffs' and Class members' personal information stored on its computer systems was vulnerable to attack;

h.   Whether Plaintiffs and Class members are entitled to recover actual damages and/or statutory damages; and

i.   Whether Plaintiffs and Class members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

74.   **Typicality.**  Plaintiffs' claims are typical of the claims of the Class. Consumer Plaintiffs and Class members were injured through Sonic's uniform misconduct and their legal claims arise from the same core Sonic practices.

75.   **Adequacy.**  Plaintiffs are adequate representatives of the proposed classes because their interests do not conflict with the interests of the Class members they seek to represent. Plaintiffs' counsel are very experienced in litigating consumer class actions and complex commercial disputes, and include lawyers who have successfully prosecuted similarly massive retail data breach cases.

76.   **Superiority.**  A class action is superior to all other available methods of fairly and efficiently adjudicating this dispute.  The injury sustained by each Class member, while meaningful on an individual basis, is not of such magnitude that it is economically feasible to

prosecute individual actions against Sonic.  Even if it were economically feasible, requiring millions of injured plaintiffs to file individual suits would impose a crushing burden on the court system and almost certainly lead to inconsistent judgments.  By contrast, class treatment will present far fewer management difficulties and provide the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

77.    Class certification also is appropriate under Fed. R. Civ. P. 23(b)(2).  Sonic has acted or has refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

78.    Finally, all members of the purposed Classes are readily ascertainable.  Sonic has access to addresses and other contact information for millions of members of the Classes, which can be used to identify Class members.

## VIOLATIONS OF STATE CONSUMER LAWS
## COUNT I
## ON BEHALF OF PLAINTIFFS AND THE SEPARATE
## STATEWIDE CONSUMER LAW CLASSES

79.    Plaintiffs reallege, as if fully set forth, the allegations of the preceding paragraphs.

80.    Plaintiffs and members of the statewide Consumer Law Classes (the "Class" for purposes of this claim) are consumers who used their payment cards to purchase products or services from Sonic primarily for personal, family, or household purposes.

81.    Sonic engaged in the conduct alleged in this Complaint in transactions intended to result, and which did result, in the sale of goods or services to consumers, including Plaintiffs and members of the Class.

82.    Sonic is engaged in, and its acts and omissions affect, trade and commerce.  Sonic's acts, practices, and omissions were done in the course of its business of marketing, offering for sale, and selling goods and services throughout the United States.

83. Sonic's conduct constitutes unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and/or unlawful acts or practices (collectively, "Deceptive Trade Practices"), including, among other things, Sonic's:

    a. Failure to maintain adequate computer systems and data security practices to safeguard customers' personal information;

    b. Failure to disclose that its computer systems and data security practices were inadequate to safeguard customers' personal information from theft;

    c. Failure to timely and accurately disclose the data breach to Plaintiffs and Class members;

    d. Continued acceptance of Plaintiffs' and Class members' credit and debit card payments and storage of other personal information after Sonic knew or should have known of the security vulnerabilities that were exploited in the data breach; and

    e. Continued acceptance of Plaintiffs' and Class members' credit and debit card payments and storage of other personal information after Sonic knew or should have known of the data breach and before it allegedly fixed the breach.

84. By engaging in such Deceptive Trade Practices, Sonic has violated state consumer laws, including those that prohibit:

    a. Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;

    b. Representing that goods and services are of a particular standard, quality or grade, if they are of another;

    c. Omitting material facts regarding the goods and services sold;

    d.  Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;

    e.  Unfair methods of competition;

    f.  Unfair, deceptive, unconscionable, fraudulent and/or unlawful acts or practices; and/or

    g.  Similar prohibitions under the state consumer laws identified below.

85.    As a direct result of Sonic violating state consumer laws, Consumer Plaintiffs and Class members suffered damages that include:

    a.  Theft of their personal information by criminals;

    b.  Fraudulent charges on their payment card accounts, some of which were never reimbursed;

    c.  Costs associated with the detection and prevention of identity theft;

    d.  Costs associated with the fraudulent use of their financial accounts;

    e.  Loss of use of and access to some or all of their account funds and costs incurred as a result of being unable to access those funds;

    f.  Costs and lost time associated with handling the administrative consequences of the data breach, including identifying, disputing, and seeking reimbursement for fraudulent charges, canceling and activating payment cards;

    g.  Purchasing products and services at Sonic that they would not have purchased, or would have not had paid the for using a payment card, had they known of Sonic's Deceptive Trade Practices;

    h.  Impairment to their credit scores and ability to borrow and/or obtain credit; and

    i.    The continued risk to their personal information, which remains on Sonic's insufficiently secured computer systems.

86.    Sonic's Deceptive Trade Practices violate the following state consumer statutes:

    a.    The Alabama Deceptive Trade Practices Act, Ala. Code §§ 8-19-5(2), (3), (5), (7), and (27), et seq.;

    b.    The Arizona Consumer Fraud Act, A.R.S. § 44-1522;

    c.    The Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-107(a)(1)(10) and 4-88-108(1)(2), et seq.;

    d.    The Colorado Consumer Protection Act, Col. Rev. Stat. Ann. §§ 6-1-105(1)(b), (c), (e) and (g), et seq.;

    e.    The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110(b), et seq.;

    f.    The Delaware Consumer Fraud Act, Del. Code Ann. Title 6 § 2513, et seq.;

    g.    The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.204(1), et seq.;

    h.    The Georgia Fair Business Practices Act, Ga. Code Ann. §§ 10-1-393(a) and (b)(2), (3), (5), and (7), et seq.;

    i.    The Idaho Consumer Protection Act, Idaho Code §§ 48-603(5), (7), (17) and (18), et seq., and Idaho Code § 48-603C, et seq.;

    j.    The Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 Ill. Stat. § 505/2, et seq., and the Illinois Uniform Deceptive Trades Practices Act, 815 Ill. Stat. §§ 510/2(a)(5), (7) and (12), et seq.;

    k.    The Indiana Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5-3(a) and (b)(1) and (2), et seq.;

l.  The Kentucky Consumer Protection Act, Ky. Rev. Stat. §§ 367.170(1) and (2), et seq.;

m.  The Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § 51:1405(A), et seq.;

n.  The Maryland Consumer Protection Act, Md. Code Commercial Law, §§ 13-301(1) and (2)(i)-(ii), and (iv), (5)(i), and (9)(i), et seq.;

o.  The Michigan Consumer Protection Act, M.C.P.L.A. §§ 445.903(1)(c)(e), (s) and (cc), et seq.;

p.  The Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44, subd. 1(5), (7) and (13), et seq., and the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69, subd. 1, and Minn. Stat. § 8.31, subd. 3(a);

q.  The Mississippi Consumer Protect Act, Miss. Code Ann. §§ 75- 24-5(1), (2)(b), (c), (e), and (g), et seq.;

r.  The Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020(1), et seq.;

s.  The Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. § 30-14-103, et seq.;

t.  The Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1602, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-302(a)(5) and (7), et seq.;

u.  The Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. §§ 41.600, 598.0923(3);

v.  The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2, et seq.;

w. The New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-2(D)(5)(7) and (14) and 57-12-3, et seq.;

x. The New York Business Law, N.Y. Gen. Bus. Law § 349(a);

y. The North Carolina Unfair Trade Practices Act, N.C.G.S.A. § 75-1.1(a), et seq.;

z. The North Dakota Unlawful Sales or Advertising Practices Act, N.D. Cent. Code § 51-15-02, et seq.;

aa. The Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. §§ 1345.02(A) and (B)(1) and (2), et seq.;

bb. The Oklahoma Consumer Protection Act, 15 Okl. Stat. Ann. §§ 53(5), (7) and (20), et seq.;

cc. The Oregon Unfair Trade Practices Act, Or. Rev. Stat. §§ 646.608(1)(e)(g) and (u), et seq.;

dd. The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-2(4)(v)(vii) and (xxi), and 201-3, et seq.;

ee. The Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws §§ 6-13.1-1(6)(v), (vii), (xii), (xiii) and (xiv), et seq.;

ff. The South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-20(a), et seq.;

gg. The South Dakota Deceptive Trade Practices Act and Consumer Protection Act, S.D. Codified Laws § 37-24-6(1), et seq.;

hh. The Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-104(a), (b)(2), (3), (5), and (7), et seq.;

ii.   The Texas Deceptive Trade Practices Consumer Protection Act, V.T.C.A., Bus. & C. §§ 17.46(a), (b)(5) and (7), et seq.;

jj.   The Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-4(1), (2)(a), (b), and (i) et seq.;

kk. The Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-200(A)(5)(6) and (14), et seq.;

ll.   The Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020, et seq.; and

mm.      The Wisconsin Deceptive Trade Practices Act, Wis. Stat §§ 100.18 and 100.20 through 100.264;

87.     The acts of the Defendant are substantially similar to those of Choicepoint, Inc. who entered into an "Assurance of Voluntary Compliance" with the State of Ohio Attorney General's office on June 14th, 2007 in Ohio Attorney General File No. PIF 10002567.  In addition to the similarity of Defendant's acts to those of Choicepoint, Inc., the acts of the Defendant are substantially similar to those of Randall Mortgage Services, Inc. and Sydmar Investments who received an Entry and Order of Default Judgment finding their actions violated Ohio Rev. Code Ann. § 1345.01, *et seq.* in Franklin County Court of Common Pleas Case No. 07-CVH-12-16960. A copy of this entry is also contained in Ohio Attorney General File No. PIF 10002748.  The acts of the Defendant have previously been found as demonstrated by these PIF files to be a violation of § 1345.01, *et seq.*, warranting treble damages for the Ohio Subclass in this matter.

88.     As a result of Sonic's violations, Consumer Plaintiffs and members of the Class are entitled to injunctive relief, including, but not limited to:

a.  Ordering that Sonic engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on its systems on a periodic basis, and ordering Sonic to promptly correct any problems or issues detected by such third-party security auditors;

b.  Ordering that Sonic engage third-party security auditors and internal personnel to run automated security monitoring;

c.  Ordering that Sonic audit, test, and train its security personnel regarding any new or modified procedures;

d.  Ordering that Sonic segment customer data by, among other things, creating firewalls and access controls so that if one area of Sonic is compromised, hackers cannot gain access to other portions of Sonic's systems;

e.  Ordering that Sonic purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services;

f.  Ordering that Sonic conduct regular database scanning and securing checks;

g.  Ordering that Sonic routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

h.  Ordering Sonic to meaningfully educate its customers about the threats they face as a result of the loss of personal information to third parties, as well as the steps its customers must take to protect themselves.

89.    Because of Sonic's Deceptive Trade Practices, Plaintiffs and the Class members are entitled to relief, including restitution of the costs associated with the data breach,

disgorgement of all profits accruing to Sonic because of its Deceptive Trade Practices, attorneys' fees and costs, declaratory relief, and a permanent injunction enjoining Sonic from its Deceptive Trade Practices.

90.     Plaintiffs bring this claim on behalf of themselves and the Class members for the relief requested and to benefit the public interest. This claim supports the public interests in assuring that consumers are provided truthful, non-deceptive information about potential purchases and protecting members of the public from Sonic's Deceptive Trade Practices. Sonic's wrongful conduct, including its Deceptive Trade Practices has affected the public at large because a substantial number of people have been impacted by Sonic's conduct.

91.     Before filing this Complaint, counsel for Consumer Plaintiffs and the Class members provided Sonic with pre-suit demand letters in compliance with state consumer laws, including Tex. Bus. & Com. Code Ann. § 17.505(a).

92.     Plaintiffs have provided notice of this action and a copy of this Complaint to the appropriate Attorneys General pursuant to Conn. Gen. Stat. § 42-110g(c); N.J. Stat. Ann. § 56:8-20; Ore. Rev. Stat. Ann. § 646.638(s); and Wash. Rev. Code § 19.86.095.

93.     Additionally, Sonic has long had notice of Plaintiffs' allegations, claims, and demands based on the numerous consumer class actions related to this Complaint.

**VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT
COUNT II
ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS**

94.     Plaintiffs reallege, as if fully set forth, the allegations of the preceding paragraphs.

95.     Plaintiffs and members of the nationwide Oklahoma Consumer Protection Act Class (the "Class" for purposes of this claim) are consumers who used their payment cards to purchase products or services from Sonic primarily for personal, family, or household purposes.

96.     Sonic is headquartered and engaged in business in Oklahoma.  Sonic's response to, and corporate decisions surrounding data security and its response to the data breach were made from and in Oklahoma.

97.     Oklahoma, which seeks to protect the rights and interests of Oklahomans and others against a company doing business in Oklahoma, has an interest in the claims of Plaintiff and the Class and is intimately concerned with the claims and outcome of this litigation.  Accordingly, Plaintiff and the Class assert claims under the Oklahoma Consumer Protection Act, ("OCPA"), 15 OKLA. STAT. tit. 15, § 751 *et seq*.

98.     Plaintiff and the Class entrusted Sonic with their personal information.

99.     As alleged herein this Complaint, Sonic engaged in unfair or deceptive acts or practices in the conduct of consumer transactions, including the following, in violation of the OCPA:

a.      Failure to maintain the security of payment card information;

b.      Failure to maintain adequate computer systems and data security practices to safeguard payment card information and other personal information;

b.      Failure to disclose that its computer systems and data security practices were inadequate to safeguard payment card information and other personal information from theft;

d.      Continued acceptance of payment card and storage of payment card and other personal information after Sonic knew or should have known of the security vulnerabilities of the systems that were exploited in the data breach;

e       Allowing unauthorized persons to have access to and make unauthorized charges to its customers' payment card accounts.

100.    Sonic knew or should have known that its computer systems and data security practices were inadequate to safeguard the personal information of Plaintiff and Class members, deter hackers, and detect a breach within a reasonable time, and that the risk of a data breach was highly likely.

101.    As a direct and proximate result of Sonic's violation of the OCPA, Plaintiff and Class members suffered damages including, but not limited to: damages arising from the unauthorized charges on their debit or credit cards or on cards that were fraudulently obtained through the use of the personal information of Plaintiff and the Class; damages arising from Plaintiff's inability to use their debit or credit cards or accounts because those cards or accounts were cancelled, suspended, or otherwise rendered unusable as a result of the data breach and/or false or fraudulent charges stemming from the data breach, including but not limited to late fees charges; damages from lost time and effort to mitigate the actual and potential impact of the data breach on their lives including, *inter alia*, contacting their financial institutions to dispute fraudulent charges, closing or modifying financial accounts, closely reviewing and monitoring their accounts for unauthorized activity, and other damages from the exposure of their personal information, which may take months if not years to discover and detect. The nature of other forms of economic damage and injury is certainly impending.

102.    Also as a direct result of Sonic's knowing violation of the OCPA, Plaintiff and the Class are entitled to damages as well as injunctive relief, including, but not limited to:

    a.    Ordering that Sonic engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Sonic's systems on a periodic basis, and ordering Sonic to promptly correct any problems or issues detected by

such third-party security auditors;

b.    Ordering that Sonic engage third-party security auditors and internal personnel to run automated security monitoring;

c.    Ordering that Sonic audit, test, and train its security personnel regarding any new or modified procedures;

d.    Ordering that Sonic segment personal information by, among other things, creating firewalls and access controls so that if one area of Sonic is compromised, hackers cannot gain access to other portions of Sonic systems;

e.    Ordering that Sonic purge, delete, and destroy in a reasonable secure manner personal information not necessary for its provisions of services;

f.    Ordering that Sonic conduct regular database scanning and securing checks;

g.    Ordering that Sonic routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

h.    Ordering Sonic to meaningfully educate its customers about the threats they face as a result of the loss of their personal information to third parties, as well as the steps Sonic customers must take to protect themselves.

103.    Plaintiffs brings this action on behalf of themselves and the Class for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff and the Class and the public from Sonic's unfair methods of competition and

unfair, deceptive, fraudulent, unconscionable and unlawful practices. Sonic's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

104.    Plaintiffs and the Class are entitled to a judgment against Sonic for actual and consequential damages, exemplary damages and attorneys' fees pursuant to the OCPA, costs, and such other further relief as the Court deems just and proper.

**NEGLIGENCE**
**COUNT III**
**(ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS, OR,**
**ALTERNATIVELY, PLAINTIFFS AND THE SEPARATE**
**STATEWIDE NEGLIGENCE CLASSES)**

105.    Plaintiffs reallege, as if fully set forth, the allegations of the preceding paragraphs.

106.    Sonic solicited, gathered, and stored personal information, including PCD, of Plaintiffs and the Nationwide Negligence Class or, alternative, the Separate Statewide Negligence Classes (collectively, the "Class" as used in this Count) to facilitate sales transactions.

107.    Sonic knew, or should have known, of the risks inherent in collecting and storing the personal information of Plaintiffs and the Class and the importance of adequate security. Sonic received warnings from within and outside the company that hackers routinely attempted to access personal information, and PCD in particular, without authorization.  Sonic also knew about numerous, well-publicized data breaches by other national retailer and restaurant chains.

108.    Sonic owed duties of care to Plaintiffs and the Class whose personal information was entrusted to it.  Sonic's duties included the following:

   a.   To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting personal information and PCD in its possession;

   b.   To protect customers' personal information and PCD using reasonable and adequate security procedures and systems that are compliant with the PCI-DSS standards and consistent with industry-standard practices;

38

     c.   To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

     d.   To promptly notifying Plaintiffs and Class members of the data breach.

109.    Because Sonic knew that a breach of its systems would damage millions of its customers, including Plaintiffs and Class members, it had a duty to adequately protect their personal information.

110.    Sonic owed a duty of care not to subject Plaintiffs and the Class to an unreasonable risk of harm because they were foreseeable and probable victims of any inadequate security practices.

111.    Sonic knew, or should have known, that its computer systems did not adequately safeguard the personal information of Plaintiffs and the Class.

112.    Sonic breached its duties of care by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard the personal information of Plaintiffs and the Class.

113.    Sonic breached its duties of care by failing to provide prompt notice of the data breach to the persons whose personal information was compromised.

114.    Sonic acted with reckless disregard for the security of the personal information of Plaintiffs and the Class because Sonic knew or should have known that its computer systems and data security practices were not adequate to safeguard the personal information that that it collected and stored, which hackers were attempting to access.

115.    Sonic acted with reckless disregard for the rights of Plaintiffs and the Class by failing to provide prompt and adequate notice of the data breach so that they could take measures

to protect themselves from damages caused by the fraudulent use the personal information compromised in the data breach.

116.    Sonic had a special relationship with Plaintiffs and the Class.  Plaintiffs' and the Class' willingness to entrust Sonic with their personal information was predicated on the understanding that Sonic would take adequate security precautions.  Moreover, only Sonic had the ability to protect its systems (and the personal information that it stored on them) from attack.

117.    Sonic own conduct also created a foreseeable risk of harm to Consumer Plaintiffs and Class members and their personal information.  Sonic's misconduct included failing to:

    a.    Secure its point-of-sale systems;

    b.    Secure access to its servers;

    c.    Comply with industry standard security practices;

    d.    Follow the PCI-DSS standards;

    e.    Encrypt PCD at the point-of-sale and during transit;

    f.    Employ adequate network segmentation;

    g.    Implement adequate system and event monitoring;

    h.    Utilize modern payment systems that provided more security against intrusion;

    i.    Install updates and patches in a timely manner; and

    j.    Implement the systems, policies, and procedures necessary to prevent this type of data breach.

118.    Sonic also had independent duties under state laws that required it to reasonably safeguard Plaintiffs' and the Class' personal information and promptly notify them about the data breach.

119.     Sonic breached the duties it owed to Consumer Plaintiffs and Class members in numerous ways, including:

a.   By creating a foreseeable risk of harm through the misconduct previously described;

b.   By failing to implement adequate security systems, protocols and practices sufficient to protect their personal information both before and after learning of the data breach;

c.   By failing to comply with the minimum industry data security standards, including the PCI-DSS, during the period of the data breach; and

d.   By failing to timely and accurately disclose that the personal information of Plaintiffs and the Class had been improperly acquired or accessed.

120.     But for Sonic's wrongful and negligent breach of the duties it owed Plaintiffs and the Class members, their personal and financial information either would not have been compromised or they would have been able to prevent some or all of their damages.

121.     As a direct and proximate result of Sonic's negligent conduct, Plaintiffs and the Class have suffered damages and are at imminent risk of further harm.

122.     The injury and harm that Consumer Plaintiffs and Class members suffered (as alleged above) was reasonably foreseeable.

123.     The injury and harm that Consumer Plaintiffs and Class members suffered (as alleged above) was the direct and proximate result of Sonic's negligent conduct.

124.     Plaintiffs and the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

### NEGLIGENCE PER SE
### COUNT IV
### (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS, OR,
### ALTERNATIVELY, PLAINTIFFS AND THE SEPARATE
### STATEWIDE NEGLIGENCE CLASSES)

125.    Plaintiffs reallege, as if fully set forth, the allegations of the preceding paragraphs.

126.    Pursuant to the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, Sonic had a duty to provide fair and adequate computer systems and data security to safeguard the personal information, including PCD, of Plaintiffs and the Nationwide Negligence Class or, alternative, the Separate Statewide Negligence Per Se Classes (collectively, the "Class" as used in this Count)

127.    The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Sonic, of failing to use reasonable measures to protect personal information.  The FTC publications and orders described above also form part of the basis of Sonic's duty in this regard.

128.    Sonic solicited, gathered, and stored personal information, including PCD, of Plaintiffs and the Class to facilitate sales transactions which affect commerce.

129.    Sonic violated the FTCA by failing to use reasonable measures to protect personal information of Plaintiffs and the Class and not complying with applicable industry standards, as described herein.

130.    Sonic's violation of the FTCA constitutes negligence *per se*.

131.    Plaintiffs and the Class are within the class of persons that the FTC Act was intended to protect.

132.    The harm that occurred as a result of the Data Breach is the type of harm the FTCA was intended to guard against.  The FTC has pursued enforcement actions against businesses,

which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

133.    As a direct and proximate result of Sonic's negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, injuries damages arising from their inability to use their debit or credit cards because those cards were cancelled, suspended, or otherwise rendered unusable as a result of the data breach and/or false or fraudulent charges stemming from the data breach, including but not limited to late fees charges; damages from lost time and effort to mitigate the actual and potential impact of the data breach on their lives including, *inter alia*, by contacting their financial institutions to place to dispute fraudulent charges, closing or modifying financial accounts, closely reviewing and monitoring their accounts for unauthorized activity which is certainly impending.

134.    According state laws in the following 12 states in which there are Sonic restaurants, Sonic had a duty to implement and maintain reasonable security procedures and practices to safeguard Plaintiffs' and Class Members' personal information:

    a.  Arkansas: Ark. Code § 4-110-104;

    b.  California: Cal Civ. Code § 1798.81.5;

    c.  Connecticut: Conn. Gen. Stat. § 42-471;

    d.  Florida: Fla. Stat. § 501.171(2);

    e.  Indiana: Ind. Code § 24-4.9-3.5;

    f.  Maryland: Md. Code. Comm. Law § 14-5303;

    g.  Massachusetts: Mass. Gen Laws Ch. 93H, § 3(a);

    h.  Nevada: Nev. Rev. Stat. § 603A.210;

    i.  Oregon: Ore. Rev. Stat. § 646A.622(1);

j.   Rhode Island: R.I. Gen Laws § 11-49.2-2(2);

k.   Texas: Tex. Bus. & Com. Code § 521.052(a); and

l.   Utah: Utah Code § 14-44-201(1)(a).

135.   Sonic uses the same computer systems and security practices in all states in which there are Sonic restaurants.

136.   Sonic breached its duties to Plaintiffs and the Class under these states' laws by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and the Class' personal information.

137.   Sonic's violation of the FTCA constitutes negligence *per se*.

**BREACH OF IMPLIED CONTRACT**
**COUNT V**
**(ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS, OR,**
**ALTERNATIVELY, PLAINTIFFS AND THE SEPARATE STATEWIDE**
**BREACH OF IMPLIED CONTRACT CLASSES)**

138.   Plaintiffs reallege, as if fully set forth, the allegations of the preceding paragraphs.

139.   When Plaintiffs and the members of the Nationwide class or, alternatively, the members of the Separate Statewide Breach of Implied Contract Classes (collectively, the "Class" as used in this Count), provided their personal information to Sonic in making purchases at Sonic restaurants, they entered into implied contracts by which Sonic agreed to protect their personal information and timely notify them in the event of a data breach.

140.   Sonic invited its customers, including Plaintiffs and the Class, to make purchases at Sonic restaurants using payment cards in order to increase sales by making purchases more convenient.

141.   An implicit part of the offer was that Sonic would safeguard the personal information using reasonable or industry-standard means and would timely notify Plaintiffs' and the Class in the event of a data breach.

142. Sonic also affirmatively represented that it collected and protected the personal information of Plaintiffs and the Class using "industry standard means."

143. Based on the implicit understanding and also on Sonic's representations, Plaintiffs and the Class accepted the offers and provided Sonic with their personal information by using their payment cards in connection with purchases at Sonic restaurants during the period of the data breach.

144. Plaintiffs and Class members would not have provided their personal information to Sonic had they known that Sonic would not safeguard their personal information as promised or provide timely notice of a data breach.

145. Plaintiffs and Class members fully performed their obligations under the implied contracts with Sonic.

146. Sonic breached the implied contracts by failing to safeguard Plaintiffs' and Class members' personal information and failing to provide them with timely and accurate notice when their personal information was compromised in the data breach.

147. The losses and damages Plaintiffs and Class members sustained (as described above) were the direct and proximate result of Sonic's breaches of its implied contracts with them.

**UNJUST ENRICHMENT**
**COUNT VI**
**(ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS, OR,**
**ALTERNATIVELY, PLAINTIFFS AND THE SEPARATE STATEWIDE**
**UNJUST ENRICHMENT CLASSES)**

148. Plaintiffs reallege, as if fully set forth, the allegations of the preceding paragraphs.

149. Plaintiffs and members of the Nationwide class or, alternatively, the members of the Separate Statewide Unjust Enrichment Classes (collectively, the "Class" as used in this Count), conferred a monetary benefit on Sonic. Specifically, they made purchases from Sonic and provided Sonic with their personal information by using their payment cards for the purchases that

they would not have made if they had known that Sonic did not provide adequate protection of their personal information.

150.     Sonic knew that Plaintiffs and the Class conferred a benefit on Sonic. Sonic profited from their purchases and used their personal information for its own business purposes.

151.     Sonic failed to secure the Plaintiffs' and Class members' personal information, and, therefore, was unjustly enriched by the purchases made by Plaintiffs and the Class that they would not have made had they known that Sonic did not keep their personal information secure.

152.     Plaintiffs and the Class have no adequate remedy at law.

153.     Under the circumstances, it would be unjust for Sonic to be permitted to retain any of the benefits that Plaintiffs and Class members of the Class conferred on it.

154.     Sonic should be compelled to disgorge into a common fund or constructive trust for the benefit of Plaintiffs and Class members proceeds that it unjustly received from them. In the alternative, Sonic should be compelled to refund the amounts that Plaintiffs and the Class overpaid.

**DECLARATORY JUDGMENT**
**COUNT VII**
**(ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS OR,**
**ALTERNATIVELY, THE SEPARATE STATEWIDE**
**NEGLIGENCE AND BREACH OF IMPLIED CONTRACT CLASSES)**

155.     Plaintiffs reallege, as if fully set forth, the allegations of the preceding paragraphs.

156.      Plaintiffs and members of the Breach of Implied Contract classes entered into an implied contract that required Sonic to provide adequate security for the personal information it collected from their payment card transactions.

157.     Sonic owes duties of care to Plaintiffs and the members of the Nationwide class or, alternatively, the separate statewide Negligence classes, that require it to adequately secure personal information.

158.     Sonic still possesses personal information regarding the Plaintiffs' and the Class members.

159.     Since the data breach, Sonic announced no changes to its data security to fix the vulnerabilities in its systems which permitted the intrusions and to prevent further attacks.

160.      Accordingly, Sonic still has not satisfied its contractual obligations and legal duties to Plaintiffs and the Breach of Implied Contract and Negligence Classes. In fact, now that Sonic's lax approach towards information security has become public, the personal information in Sonic's possession is more vulnerable than previously.

161.     Actual harm has arisen in the wake of Sonic's data breach regarding its contractual obligations and duties of care to provide security measures to Plaintiffs and the members of the Breach of Implied Contract and Negligence Classes.  Further, Plaintiffs and the members of the Breach of Implied Contract and Negligence Classes are at risk of additional or further harm due to the exposure of their personal information and Sonic's failure to address the security failings that lead to such exposure.

162.     There is no reason to believe that Sonic's security measures are any more adequate than they were before the breach to meet Sonic's contractual obligations and legal duties.

163.     Plaintiffs, therefore, seek a declaration (1) that Sonic's existing security measures do not comply with its contractual obligations and duties of care to provide adequate security, and (2) that to comply with its contractual obligations and duties of care, Sonic must implement and maintain reasonable security measures, including, but not limited to:

       a.     Ordering that Sonic engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Sonic's systems on a periodic basis, and ordering

Sonic to promptly correct any problems or issues detected by such third-party security auditors;

b.  Ordering that Sonic engage third-party security auditors and internal personnel to run automated security monitoring;

c.  Ordering that Sonic audit, test, and train its security personnel regarding any new or modified procedures;

d.  Ordering that Sonic segment customer data by, among other things, creating firewalls and access controls so that if one area of Sonic is compromised, hackers cannot gain access to other portions of Sonic's systems;

e.  Ordering that Sonic purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services;

f.  Ordering that Sonic conduct regular database scanning and  securing checks;

g.  Ordering that Sonic routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

h.  Ordering Sonic to meaningfully educate its customers about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps Sonic customers must take to protect themselves.

## **PRAYER FOR RELIEF**

164.  WHEREFORE, Plaintiffs, on behalf of themselves and the Classes described above, seek the following relief:

a.  An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the classes as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Classes requested herein;

b.  A judgment in favor of Plaintiffs and the Class awarding them appropriate monetary relief, including actual damages, punitive damages, statutory damages, , equitable relief, restitution, disgorgement, attorney's fees, statutory costs, and such other and further relief as is just and proper.

c.  An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d.  An order requiring Sonic to pay the costs involved in notifying the Class members about the judgment and administering the claims process;

e.  A judgment in favor of Plaintiffs and the Classes awarding them pre-judgment and post judgment interest, reasonable attorneys' fees, costs and expenses as allowable by law; and

f.  An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

165.  Plaintiffs demand a trial by jury on all triable issues.

February 12, 2018                          Respectfully Submitted,

                                           /s/ *William B. Federman*
                                           William B. Federman
                                           Carin L. Marcussen
                                           Joshua D. Wells
                                           FEDERMAN & SHERWOOD
                                           10205 N. Pennsylvania Ave.
                                           Oklahoma City, OK 73120
                                           Telephone:  (405) 235-1560
                                           Facsimile:  (405) 239-2112
                                           wbf@federmanlaw.com
                                           clm@federmanlaw.com
                                           jdw@federmanlaw.com

                                           *Interim Lead Counsel*

                                           Marc E. Dann (0039425)
                                           Brian D Flick (0081605)
                                           DANNLAW
                                           P.O. Box 6031040
                                           Cleveland, OH  44103
                                           Telephone: (216) 373-0539
                                           Facsimile:  (216) 373-0536
                                           notices@dannlaw.com

                                           *Interim Liaison Counsel*

                                           Thomas A. Zimmerman, Jr.
                                           ZIMMERMAN LAW OFFICES, P.C.
                                           77 W. Washington Street, Suite 1220
                                           Chicago, IL 60602
                                           Telephone:  (312) 440-0020
                                           Facsimile:  (312) 440-4180
                                           tom@attorneyzim.com

                                           Melissa R. Emert
                                           STULL, STULL, & BRODY
                                           6 East 45th Street
                                           New York, NY 10017
                                           Telephone:  (954) 341-5561
                                           Facsimile:  (954) 341-5531
                                           memert@ssbny.com

Michael Fuller
OLSEN DAINES
US Bancorp Tower
111 Southwest 5th Ave, Suite 3150
Portland, OR 97204
Telephone:  (503) 201-4570
Facsimile:   (503) 362-1375
michael@underdoglawyer.com

Miles N. Clark
KNEPPER & CLARK LLC
10040 W. Cheyenne Ave., Suite 170-109
Las Vegas, NV 89129
Telephone:  (702) 825-6060
Facsimile:   (702) 447-8048
miles.clark@knepperclark.com

*Plaintiffs' Steering Committee*

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2018, a copy of the foregoing was served via ECF upon the following counsel for Defendants:

Kari M. Rollins
SHEPPARD    MULLIN    RICHTER    &
HAMPTON LLP
30 Rockefeller Plaza
New York, NY 10112
Telephone: 212.634.3077
Fax: 917.438.6173
krollins@sheppardmullin.com

Craig C. Cardon
SHEPPARD    MULLIN    RICHTER    &
HAMPTON LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
Telephone: 310.228.3749
Fax: 310.228.3701
ccardon@sheppardmullin.com

Liisa Thomas
David M. Poell
SHEPPARD    MULLIN    RICHTER    &
HAMPTON LLP
Three First National Plaza
70 West Madison Street, 48th Floor
Chicago, IL 60602
Telephone: 312.499.6335
Fax: 312.499.4731
lmthomas@sheppardmullin.com
dpoell@sheppardmullin.com

David A. Riepenhoff
Melanie J. Williamson
FISHEL HASS KIM ALBRECHT
DOWNEY LLP
7775 Walton Parkway, Suite 200
New Albany, OH 43054
Telephone: 614.221.1216 –
Fax:  614.221.8769
driepenhoff@fishelhass.com
mwilliamson@fishelhass.com

51

A  copy  of  the  foregoing  was  served  via  U.S.  Mail,  postage  pre-paid,  return  receipt requested upon the following:

George Jepsen
Connecticut Attorney General
55 Elm Street
Hartford, Connecticut 06141-0120

Michelle Seagull
Connecticut Commissioner of Consumer
Protection
450 Columbus Boulevard, Suite 901
Hartford, Connecticut  06103-1840

Gurbir Grewal
New Jersey Attorney General
RJ Hughes Justice Complex
25 Market Street, Box 080
Trenton, NJ 08625-0080

Ellen Rosenblum
Oregon Attorney General
1162 Court St. NE
Salem, OR 97301-4096

Bob Ferguson
Washington Attorney General
800 5th Ave, Suite 2000
Seattle, WA  98104-3188

/s/ *William B. Federman*
William B. Federman
*Interim Lead Counsel for Plaintiffs*

52