**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION AT CLEVELAND**

| | | |
|---|---|---|
| IN RE: SONIC CORP. CUSTOMER | § | MDL Case No. 1:17-md-02807-JSG |
| DATA BREACH LITIGATION | § | |
| | § | JUDGE JAMES S. GWIN |
| THIS DOCUMENT RELATES TO: | § | |
| ALL CASES | § | |

**PLAINTIFFS' MEMORANDUM
OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR
<u>FINAL APPROVAL OF AMENDED CLASS ACTION SETTLEMENT AGREEMENT</u>**

William B. Federman
Carin L. Marcussen
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone:  (405) 235-1560
Facsimile:  (405) 239-2112
wbf@federmanlaw.com
clm@federmanlaw.com

*Interim Lead Counsel*

Thomas A. Zimmerman, Jr.
ZIMMERMAN LAW OFFICES, P.C.
77 W. Washington Street, Suite 1220
Chicago, IL 60602
Telephone:  (312) 440-0020
Facsimile:  (312) 440-4180
tom@attorneyzim.com

*Member of Plaintiffs' Steering Committee*

Michael Fuller
OLSEN DAINES
US Bancorp Tower
111 Southwest 5th Ave, Suite 3150
Portland, OR 97204
Telephone:  (503) 201-4570
Facsimile:  (503) 362-1375
michael@underdoglawyer.com

*Member of Plaintiffs' Steering Committee*

Marc E. Dann (0039425)
Brian D Flick (0081605)
DANNLAW
P.O. Box 6031040
Cleveland, OH  44103
Telephone: (216) 373-0539
Facsimile:  (216) 373-0536
notices@dannlaw.com

*Interim Liaison Counsel*

Melissa R. Emert
STULL, STULL, & BRODY
6 East 45th Street
New York, NY 10017
Telephone:  (954) 341-5561
Facsimile:  (954) 341-5531
memert@ssbny.com

*Member of Plaintiffs' Steering Committee*

Miles N. Clark
KNEPPER & CLARK LLC
10040 W. Cheyenne Ave., Suite 170-109
Las Vegas, NV 89129
Telephone:  (702) 825-6060
Facsimile:  (702) 447-8048
miles.clark@knepperclark.com

*Member of Plaintiffs' Steering Committee*

## TABLE OF CONTENTS

I.    FACTUAL AND PROCEDURAL HISTORY OF THIS LITIGATION ......................1

II.   SUMMARY OF THE SETTLEMENT ...................................................................6

    A.    The Settlement Class.................................................................................6

    B.    Payments to Settlement Class Members ...................................................6

    C.    Agreement Relating to Sonic's Business Practices .................................7

    D.    Class Representative Service Awards and Individual Payments ....................7

    E.    Attorneys' Fees and Costs .........................................................................8

    F.    Settlement Class Notice .............................................................................8

III.  THE RESULTS OF THE SETTLEMENT .............................................................9

IV.   THE COURT SHOULD GRANT FINAL APPROVAL OF THE
      PROPOSED SETTLEMENT .................................................................................15

    A.    The *Gascho* Factors Weigh in Favor of Granting Final Approval.................16

        1.    The Absence of Fraud or Collusion Supports Approving the
            Amended Settlement Agreement ...........................................................17

        2.    The Complexity, Time, and Expense of Continued Litigation
            Against the Defendant Supports Approving the Settlement
            Agreement.............................................................................................18

        3.    The Extensive Discovery Engaged in by the Parties
            Supports Approving the Amended Settlement Agreement..................20

        4.    The Relief Obtained by the Settlement, Weighed Against the
            Likelihood of Success on the Merits, Supports Approving the
            Amended Settlement Agreement ...........................................................22

        5.    The Opinions of Class Counsel and Class Representatives
            Support Approving the Amended Settlement Agreement ...................24

        6.    The Reaction of Absent Settlement Class Members Support
            Approving the Amended Settlement Agreement .................................25

**7.      The Public Interest Supports Approving the Amended Settlement
         Agreement ..............................................................................................27**

**V.      CONCLUSION ..............................................................................................28**

## **TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Aboudi v. T-Mobile USA, Inc.*
   2015 WL 4923602 (S.D. Cal. Aug. 18, 2015) ........................................................ 26

*Berry v. School Dist. of City of City of Benton Harbor*
   184 F.R.D. 93 (W.D. Mich. 1998) ...................................................................... 18

*Blank v. Talley Industries, Inc.*
   64 F.R.D. 125 (S.D. N.Y. 1974) ........................................................................ 24

*Churchill Vill., LLC v. Gen. Elec,*
   361 F.3d 566 (9th Cir. 2004) ............................................................................ 26

*Coulter-Owens v. Rodale, Inc.*
   2016 WL 5476490 (E.D. Mich. Sept. 29, 2016) ............................................. 26, 27

*Fisher Brothers v. Phelps Dodge Industries Inc.*
   604 F. Supp. 446 (E.D. Pa. 1985) ...................................................................... 24

*Forcellati v. Hyland's, Inc.,*
   2014 WL 1410264 (C.D. Cal. 2014) .................................................................. 13

*Gascho v. Glob. Fitness Holdings, LLC*
   822 F.3d 269 (6th Cir. 2016) ..................................................................... passim

*Gilbert v. Abercrombie & Fitch, Co.*
   2016 WL 4159682 (S.D. Ohio Aug. 5, 2016) .................................................... 20

*GMAC Mortg. Corp. v. Stapleton*
   236 Ill.App.3d 486 (1st Dist. 1992) ................................................................... 26

*Goldsmith v. Tech. Solutions, Co.*
   1995 WL 17009594 (N.D. Ill. Oct. 10, 1995) ..................................................... 26

*Granada Investments, Inc. v. DWG Corp.*
   962 F.2d 1203 (6th Cir. 1992) ........................................................................... 16

*Hainey v. Parrott*
   617 F. Supp. 2d 668 (S.D. Ohio 2007) ............................................................. 27

*In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*
   789 F. Supp. 2d 935 (N.D. Ill. 2011) ................................................................. 20

*In re Austrian & German Bank Holocaust Litig.*
   80 F. Supp. 2d 164 (S.D.N.Y. 2000) ............................................................ 18, 20

*In re Cardizem CD Antitrust Litig.*
  218 F.R.D. 508 (E.D. Mich. 2003) ................................................................. 22, 27

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
  370 F. Supp. 2d 320 (D. Me. 2005) ...................................................................... 12

*In re Elan Secs. Litig.*
  385 F. Supp. 2d 363 (S.D.N.Y. 2005).................................................................... 20

*In re Mex. Money Transfer Litig.*
  164 F. Supp. 2d 1002 (N.D. Ill. 2000) .................................................................. 26

*In re Mex. Money Transfer Litig.*,
  164 F. Supp. 2d 1002 (N.D. Ill. 2000) .................................................................. 11

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
  2011 WL 1398485 (D. Me. 2011) .......................................................................... 12

*In re Online DVD-Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir. 2015) ................................................................................. 12

In re Rio Hair Naturalizer Prod. Litig.
  1996 WL 780512 (E.D. Mich. December 20, 1996) ............................................... 15

In re Southern Ohio Correctional Facility
  173 F.R.D. 205 (S.D. Ohio 1997) .......................................................................... 15

*In re Sunrise Sec. Litig.*
  131 F.R.D. 450 (E.D. Pa. 1990).............................................................................. 20

*In re Telectronics Pacing Systems, Inc.*
  137 F. Supp. 2d 985 (S.D. Ohio 2001) ............................................................. 15, 18

*In re TJX Cos. Retail Sec. Breach Litig.*,
  584 F. Supp. 2d 395 (D. Mass. 2008) .................................................................... 12

*Int'l Union v. Ford Motor Co.*
  2006 WL 1984363 (E.D. Mich. July 13, 2006) ..................................................... 17

*Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp.*,
  497 F.3d 615, 631 (6th Cir. 2007) .................................................................... 16, 22

*IUE-CWA v. General Motors Corp.*
  238 F.R.D. 583 (E.D. Mich. 2006) ........................................................................ 16

*McBean v. City of New York*
  233 F.R.D. 377 (S.D.N.Y. 2006) ........................................................................... 20

iv

*Montoya v. PNC Bank, N.A.*,
　2016 WL 1529902 (S.D. Fla. 2016) ................................................................. 13

*Myszka v. National Collegiate Scouting Ass'n, Inc.*
　2014 WL 1364468 (N.D. Ill. Mar. 19, 2014) .................................................... 26

Parker v. Anderson
　667 F.2d 1204 (1982) ......................................................................................... 15

*Poertner v. Gillette Co.*,
　618 F. App'x 624 (11th Cir. 2015) .................................................................... 12

*Pollard v. Remington Arms Co., LLC*,
　896 F.3d 900 (8th Cir. 2018) ............................................................................. 12

*Priddy v. Edelman*
　883 F.2d 438 (6th Cir. 1989) ............................................................................. 23

*Shames v. Hertz Corp.*,
　2012 WL 5392159 (S.D. Cal. 2012) ................................................................. 13

*Strong v. BellSouth Telcoms., Inc.*,
　173 F.R.D. 167 (W.D. La. 1997) ....................................................................... 13

*Touhey v. United States*,
　2011 WL 3179036 (C.D. Cal. 2011) ................................................................. 12

*UAW v. General Motors Co.*
　2006 WL 891151 (Mar. 1, 2006) ....................................................................... 16

*Weinberger v. Kendrick*
　698 F.2d 61 (2d Cir. 1982) ................................................................................ 20

*White v. Experian Info. Solutions, Inc.*,
　803 F. Supp. 2d 1086 (C.D. Cal. 2011) ............................................................. 12

## Other Authorities

*Federal Practice and Procedure: Civil 2d*
　(2d ed. 1986) ...................................................................................................... 15

Manual for Complex Litigation
　(3d ed.1995) ........................................................................................................ 15

*Manual for Complex Litigation*
　(4th ed. 2004) ..................................................................................................... 15

Penny Bolin, Shannon Gannon, Henry Gil, Esmeralda Hernandez, Melvin Hildreth III, Megan MacKay, Dometric Pearson, Paula Sbabo, and Cassandra Sharp ("Representative Plaintiffs"), individually and on behalf of a settlement class as defined in the Amended Settlement Agreement ("Settlement" or "Agreement") and set forth below (the "Settlement Class"), and Septabeya Bean, Patrick Blanford, Cornelius Bogard, Shadawna Carson, John Dolembo, Carlton Donovan, Vonda Hoover, Barbara Kelley, Mark Korabelnikov, Denise Ramirez, Edward Ramirez, Linda Sipple, and Angela Williams ("Individual Named Plaintiffs") (together with Representative Plaintiffs, "Plaintiffs"), by and through their collective counsel William B. Federman of Federman & Sherwood ("Interim Lead Counsel");  Marc E. Dann of DannLaw ("Interim Liaison Counsel"); Carin L. Marcussen of Federman & Sherwood; Brian D. Flick of DannLaw; Thomas A. Zimmerman, Jr. of Zimmerman Law Offices, P.C.; Melissa R. Emert of Stull, Stull, & Brody; Michael Fuller of Olsen Daines; and Miles N. Clark of Knepper & Clark LLC ("Plaintiffs' Steering Committee") (collectively, "Plaintiffs' Counsel" or "Class Counsel"), respectfully submit the following Memorandum of Points and Authorities in Support of their Motion for Final Approval of the Amended Class Action Settlement Agreement, which this Court preliminarily approved on December 20, 2018. (Dkt. No. 145).

## I.      FACTUAL AND PROCEDURAL HISTORY OF THIS LITIGATION

Sonic is the fourth largest quick-service burger restaurant chain in the United States, operating more than 3,500 stores in 44 states. Sonic Drive-In restaurants routinely process consumer transactions through point-of-sale ("POS") systems that transmit payment card data of customers who pay with a credit or debit card.

In late September 2017, Sonic was alerted by its third-party payment card processor of fraudulent activity involving payment cards that had been used at certain Sonic Drive-In locations.

Upon being alerted of the suspicious activity, Sonic initiated an internal investigation and engaged experienced third-party forensic investigators to investigate the suspicious activity. At the same time, Sonic also notified federal law enforcement and began working with law enforcement to investigate the suspicious activity. Shortly thereafter, Sonic's forensic investigators discovered that certain Sonic Drive-In locations had been the victim of a malware attack that appeared to have allowed unauthorized persons to acquire payment card data.

Four (4) days later, on October 4, 2017, though its forensic investigations into the nature and extent of the data breach were still underway, Sonic made the statutorily permissible substitute notice to Sonic customers via its website, via national press release (distributed through the Business Wire), and by taking advertisements out in certain local media outlets and publications as required by certain state data breach notification statutes. At the same time, Sonic also notified the requisite state regulators and credit bureaus of the data breach. Further, as a precautionary measure, Sonic offered customers who used their credit or debit cards at Sonic Drive-In locations in 2017, twenty-four (24) months of free fraud detection and identity theft protection through Experian's IdentityWorks program.

After issuing notice, Sonic continued to investigate the nature and extent of the data breach. Based on Sonic's investigation, Sonic identified three hundred and twenty-five (325) franchisee-owned and -operated Sonic Drive-In locations for which the forensic evidence indicates that customer credit or debit card information was stolen.

In response to Sonic's data breach, eight (8) data breach class actions were filed in federal court in several different states and eventually consolidated and transferred to this Court by the Judicial Panel on Multidistrict Litigation. (Dkt. Nos. 1, 3. 17). On January 3, 2018, the Court granted the unanimous and unopposed motion by the plaintiffs in the consolidated actions, (Dkt.

No. 4), to appoint William B. Federman of Federman & Sherwood as Interim Lead Counsel, Marc Dann of DannLaw as Interim Liaison Counsel, and Thomas A. Zimmerman, Jr. of Zimmerman Law Offices, P.C., Melissa R. Emert of Stull, Stull, & Brody, Michael Fuller of Olsen Daines, and Miles N. Clark of Knepper & Clark LLC as members of Plaintiffs' Steering Committee. (Non-document Order entered 01/03/2018).

At the early stage of the litigation, Plaintiffs' counsel filed a Motion for Expedited Discovery Relative to the Identities of Knowledgeable Third Parties. (Dkt. No. 14). On January 13, 2018, the Court granted in part and denied in part Plaintiffs' motion to authorize expedited discovery. (Dkt. No. 24). On February 12, 2018, Plaintiffs filed a Consolidated Class Action Complaint. (Dkt. No. 26). On March 14, 2018, Sonic filed a motion to dismiss Plaintiffs' Consolidated Class Action Complaint. (Dkt. No. 39). On April 13, 2018, Plaintiffs filed their opposition to Sonic's motion to dismiss, and Sonic filed its reply on April 27, 2018. (Dkt. No. 73). On July 27, 2018, prior to any decision on Sonic's motion to dismiss, Class Counsel filed a Second Amended Consolidated Class Action Complaint on behalf of the Representative Plaintiffs. (Dkt. No. 114).

Throughout the Litigation, the Parties engaged in substantial discovery. As part of the discovery process, Class Counsel: negotiated the protective order regarding confidential materials (Dkt. No. 67); prepared and served detailed document requests and interrogatories on the Sonic Defendants; prepared and served twenty (20) subpoenas *duces tecum* on third parties (Dkt. Nos. 32, 36, 37, 38, 64, 66, 77, 92); engaged in numerous meet and confers with Sonic and third parties concerning the scope of document productions, ESI protocols, search terms, and document custodians; responded to the Sonic Defendants' requests for production and interrogatories, including gathering and producing responsive documents from numerous Plaintiffs; defended the

depositions of Plaintiffs Bogard, Dolembo, Pearson, MacKay, Ramirez, and Bean; prepared for and deposed Mark Davis, Sonic's Vice President of Cybersecurity and Enterprise Systems during the Class Period; negotiated and obtained evidentiary affidavits, in lieu of depositions, from third party vendors addressing their role in Sonic's information technology and cybersecurity systems and processes; prepared, exchanged, and served several letters to Defense Counsel concerning document production and other discovery issues; filed motions against Sonic and third parties First Data Corporation, Oracle Hospitality, Inc., SCI Group, LLC, ServiceNow, and Texas P.O.S. to compel the production of documents (Dkt. No. 81) and argued those motions before the Court; filed an opposition to Sonic's motion for protective order relating to production by third-party CoalFire Systems, Inc. (Dkt. No. 88); filed an opposition to Sonic's motion to compel initial disclosures (Dkt. No. 41) and argued against that motion in a hearing before the Magistrate Judge; reviewed and analyzed more than 130,000 pages of documents produced by Sonic and third parties; interviewed several former Sonic employees identified by Sonic as having relevant knowledge; and retained and consulted with multiple experts, including cybersecurity experts and damages experts. (Dkt, No. 157-2, Declaration of [Interim Lead Counsel for Plaintiffs] William B. Federman ("Decl."), at ¶ 8.

On June 5, 2018, the Court referred the matter to Magistrate Judge Jonathan D. Greenberg for mediation. (Dkt. No. 105). In advance of the mediation, Class Counsel prepared a Confidential Mediation Statement, which was submitted via email to the chambers of Judge Greenberg. On August 3, 2018, the Parties participated in a full-day mediation presided over by Judge Greenberg. (Dkt. No. 119). Given that substantial progress was made towards a settlement, the Parties participated in a second full day of mediation with Judge Greenberg on August 10, 2018. (Dkt. No. 121). On August 10, 2018, the Parties were able to reach an agreement as to the material terms

of the settlement, which were memorialized on the record that same day. (Dkt. No. 124). Thereafter, the Parties negotiated the remaining terms, exchanging drafts of the Settlement Agreement and its exhibits during the process. The Settlement Agreement was finalized and executed on October 9, 2018. Representative Plaintiffs moved for preliminary approval of that Settlement Agreement on October 10, 2018. (Dkt. No. 132). After a telephone conference with the Court and responding to the Court's questions (Dkt Nos. 138, 139), the Parties agreed to an Amended Settlement Agreement, which was executed on December 13, 2018, and submitted to the Court for approval on December 14, 2018. (Dkt. No. 144). The Court entered its order of preliminary approval on December 20, 2018. (Dkt. No. 145).

On January 19, 2019, notice to putative Settlement Class members was commenced in accordance with the Notice Plan approved by the Court. *See* Declaration of Orlando Castillejos, on behalf of Settlement Administrator, regarding Notice and Claims ("Castillejos Decl."), attached hereto as **Exhibit 1**.

On June 14, 2019, Plaintiffs filed their Amended Motion for Attorneys' Fees, Costs and Expenses, Service Awards for Representative Plaintiffs, and Individual Payments to Individual Named Plaintiffs ("Fee Petition") (Dkt. No. 157). In conjunction with the Fee Petition, Plaintiffs' Counsel filed under seal the detailed time and expense records showing the time and effort that Class Counsel and Representative Plaintiffs spent on this case. (Dkt. No.158). Additionally, the Fee Petition described the Settlement's benefits to Settlement Class Members, the complex legal issues involved in this case, and the risk that continued litigation of this matter would place on Settlement Class Members. (Dkt. No. 157). Plaintiffs hereby incorporate the arguments contained in the Fee Petition in support of their motion for final approval of the Agreement.

## II.    SUMMARY OF THE SETTLEMENT

### A.    The Settlement Class

Under the terms of the Settlement, the Parties agreed to certification pursuant to Federal Rule of Civil Procedure 23(b)(3) of a Settlement Class for settlement purposes only:

> All residents of the United States who made a purchase at one of the 325 Impacted Sonic Drive-Ins and paid using a debit or credit card during the period of time from April 7, 2017 through October 28, 2017.

(SA[1], ¶¶ 1.26, 1.28.)[2]

The "Impacted Sonic Drive-Ins" are defined in the Agreement as the three hundred and twenty-five (325) franchisee-owned and -operated Sonic Drive-In locations for which the forensic evidence indicates that customer credit or debit card information was stolen during the Data Breach, as listed in Exhibit A to the Agreement. (SA, ¶ 1.13.) The "Data Breach" means the third-party cyberattack targeting the point-of-sale systems of Sonic Drive-Ins from April 7, 2017 through October 28, 2017 in an effort to acquire, without authorization, customer payment card information. (SA, ¶ 1.10.)

### B.    Payments to Settlement Class Members

The Settlement provides that the Sonic Defendants will pay Four Million Three Hundred Twenty-Five Thousand Dollars and Zero Cents ($4,325,000.00) into a "Settlement Fund." (SA, ¶¶ 1.30, 3.1.) After deducting the Costs of Settlement Administration (as defined in SA, ¶ 1.9), Attorneys' Fees and Costs (as defined in SA, ¶ 1.1), Class Representative Service Awards (as

---

[1] The Agreement is cited herein as "SA." The definitions in the Agreement are incorporated herein by reference.

[2] The Settlement Class specifically excludes: (i) Sonic (as defined in SA, ¶ 1.31); (ii) Sonic Franchisees (as defined in SA, ¶ 1.33); (iii) Infor (as defined in SA, ¶ 1.16); (iv) all Settlement Class Members who timely and validly request exclusion from and/or opt-out of the Settlement Class; (v) the Judge or Magistrate Judge to whom the action is assigned and, any member of those Judges' staffs or immediate family members; and (vi) any other person found by a court of competent jurisdiction to be guilty under criminal law of initiating, causing, aiding or abetting the criminal activity or occurrence of the Data Breach or who pleads *nolo contendere* to any such charge. (SA, ¶ 1.27.)

defined in SA, ¶ 1.8), and "Individual Payments" (as defined in SA, ¶ 1.14), the "Net Settlement Fund" remaining will be distributed to Settlement Class Members who submit Verified Claims. (SA, ¶ 3.1.5.) The amount of the payment will be (i) approximately $10 for those Settlement Class Members who made a purchase using a credit or debit card at one of the Impacted Sonic Drive-Ins during the Settlement Class Period ("Category 1 Class Members"), or (ii) approximately $40 for those Settlement Class Members who made a purchase using credit or debit card at one of the Impacted Sonic Drive-Ins during the Settlement Class Period *and* who experienced fraudulent or unauthorized charges on the credit or debit card account used at the Impacted Sonic Drive-In location any time thereafter up through February 28, 2018 ("Category 2 Class Members"). (SA, ¶ 3.1.5.) The Settlement Administrator will adjust the amounts of the payments to Settlement Class Members by decreasing or increasing them on a *pro rata* (proportionate) basis such that the total aggregate amount of Verified Claims to be paid does not exceed the Net Settlement Fund or, alternatively, in order to fully allocate and pay to Settlement Class Members the full Net Settlement Fund so that no money remains in the Settlement Fund. (SA, ¶ 3.1.6.). No monies will revert to the Sonic Defendants. *Id.*

### C.     Agreement Relating to Sonic's Business Practices

Sonic has acknowledged that it made certain governance changes since the filing of the Litigation. Additionally, Sonic has agreed to continue using and employing the certain data security practices outlined in the Agreement for a period of no less than three (3) years. (SA, ¶¶ 3.3, 3.4.)

### D.     Class Representative Service Awards and Individual Payments

Class Counsel's Fee Petition makes an application to the Court for an aggregate amount of $42,000 to be distributed to the Representative Plaintiffs as their Class Representative Service

Awards and to the Individual Named Plaintiffs as Individual Payments in recognition of their role as catalysts of this Litigation, for their time and efforts spent in prosecuting this Litigation to the benefit of the Settlement Class, and in consideration for their Released Claims. (SA, ¶ 10.7.) The Sonic Defendants have agreed not to oppose or object to any such application that is consistent with the terms of the Agreement. *Id.*

Representative Plaintiffs' support for the Agreement as fair and reasonable is not conditioned upon the Court's award of the requested Service Awards or Individual Payments. Further, the terms and enforcement of the Agreement is not conditioned on the approval of the requested Service Awards or Individual Payments. (SA, ¶10.8.)

### E.    Attorneys' Fees and Costs

Class Counsel filed a Fee Petition (Dkt. No. 151) with the Court for payment from the Settlement Fund of attorneys' fees of up to one-third (1/3) of the Settlement Fund (*i.e.*, up to $1,441,666.67), plus the costs and expenses that Class Counsel has incurred in the prosecution of this Litigation ("Attorneys' Fees and Costs"). (SA, ¶¶ 1.1, 10.1.) Sonic has agreed it will not oppose or object to any such application. (SA, ¶ 10.2.) The amount of Attorneys' Fees and Costs awarded by the Court shall be deducted from the Settlement Fund and paid by the Settlement Administrator to Lead Counsel, who will, in his sole discretion, fairly and reasonably allocate and distribute the amounts among Class Counsel. (SA, ¶¶ 10.1.) Class Counsel's support of the Agreement as fair and reasonable is not conditioned upon the Court's award of the requested fees and expenses, and the terms and enforcement of the Agreement are not conditioned on the approval of an award of the requested fees and expenses. (SA, ¶ 10.6.)

F.      **Settlement Class Notice**

The Agreement provides that the Costs of Settlement Administration (as defined in the Agreement (SA, ¶ 1.9), which includes all costs for notice, as well as claims administration) shall be paid from the Settlement Fund. (SA, ¶ 3.1.1.) Further, the Agreement provides for a comprehensive Notice Program to be administered by the Settlement Administrator, subject to Court approval. (SA, § 7, ¶ 1.25.) The Court previously approved the Notice Program finding that the Notices attached to the Agreement collectively provide a sufficiently clear and concise description of the Litigation, the Settlement terms, and the rights and responsibilities of the Settlement Class Members. (*See* Preliminary Approval Order, Dkt. No. 145, at ¶ 9). The Court further found that the plan for dissemination of the Notices is the best means practicable, and is reasonably calculated to apprise the Settlement Class Members of the Litigation and their right to participate in, object to, or exclude themselves from the Settlement. *Id.*

III.    **THE RESULTS OF THE SETTLEMENT**

On January 18, 2019, the Settlement Administrator, Kurtzman Carson Consultants ("KCC"), commenced notice in accordance with the Notice Program approved by the Court. (*See* Castillejos Decl., ¶¶ 4-10). On January 18, 2019, KCC established a website for this Settlement at www.SonicDataBreachSettlement.com. (Castillejos Decl. ¶ 4). On the website, visitors can view answers to frequently asked questions, and download important case documents, including the Amended Settlement Agreement, Preliminary Approval Order, Long Form Notice, Claim Form, and List of Impacted Sonic Drive-In locations. (*Id.*). Visitors could also submit claims online. (*Id.*). On January 18, 2019, KCC established a toll free telephone number that Class Members could call and listen to answers to Frequently Asked Questions, and request that a Claim Form be mailed to them. (*Id.* ¶ 5). KCC caused indirect notice in the form of magazine publication, press release, and

9

Internet ads. (*Id.* ¶¶ 6-8). The Summary Notice was published in the March 2019 issue (on-sale February 22, 2019) of Southern Living Magazine. (*Id.* ¶ 6; *see also* Dkt. No. 138 at pp. 6-7, explaining the publication notice). Additionally, KCC purchased 16,500,000 impressions to be distributed via Google Display Network (GDN) and Facebook, which ran from January 19, 2019 through April 19, 2019. (Castillejos Decl. ¶ 7). On February 28, 2019, KCC caused an informational press release to be issued to press outlets nationwide via PR Newswire. (*Id.* ¶ 8). To further extend media coverage, KCC provided settlement information and a link to the settlement website to a variety of coupon and savings websites and blogs. (*Id.* ¶ 9). This outreach took place from February 28, 2019 through March 1, 2019. (*Id.*). The Agreement also provided for In-Store Notice to be printed or otherwise electronically generated by the Settlement Administrator. (*Id.* ¶ 10). KCC provided the In-Store Notice to the Sonic Defendants for dissemination and posting at the Impacted Sonic Drive-In locations. (*Id.*). The Sonic Defendants distributed the In-Store Notice to the Impacted Sonic Drive-In locations and, in compliance with the Settlement Agreement, within 45 days after the entry of the Preliminary Approval Order, the In-Store Notice was conspicuously posted on the main door of each of the Impacted Sonic Drive-In locations facing outwards, and each such In-Store Notice was posted for a period of at least 90 days from the start of the Notice Program. (*See* Dkt. No. 159, Declaration of Kristin Greenhaw, Esq., at ¶ 2). Within 30 days after the entry of the Preliminary Approval Order, the Sonic Defendants caused the Website Notice to be conspicuously posted as a banner advertisement at the top of the home page of Sonic's website and as a "pinned" post at the top of Sonic's Facebook page for at least 90 days from the start of the Notice Program. (*Id.* at ¶ 3). The Website Notice on Sonic's website was linked to the Long Form Notice on the Settlement Website.  (*Id.*).

The Court-approved notice program proved to be incredibly effective at reaching Settlement Class Members. A total of 16,716,166 impressions were delivered via Google Display Network (GDN) and Facebook, resulting in an additional 216,166 impressions at no extra charge. (Castillejos Decl. ¶ 7). There were 191,147 visitors to the settlement website, and 178 calls to the toll free telephone number. (*Id.* ¶ 11). Using advertising-industry standard reach calculations, the combined, net reach of the Notice Program is estimated to have reached at least 74.1% of Class Members. (*Id.*, ¶ 12). Thus, the Notice Program, as designed and implemented, certainly constituted the best notice practicable under the circumstances, complies with Fed. R. Civ. P. 23(c), and satisfies due process requirements.

During the mediation, there were significant discussions and exchanges of discovery (including Sonic's sales information) regarding the estimated size of the Class. Based on this discovery, the Parties estimate that there were 1,500,000 customers who made a purchase at one of the 325 Impacted Sonic Drive-In locations using a credit or debit card during the approximately seven (7) month Class period.[3] Of the estimated 1,500,000 potential Settlement Class Members, there were ***no*** objections filed by any Settlement Class Members and ***no*** requests for exclusion (opt-outs). (Castillejos Decl., ¶¶ 13-14). This lack of resistance to the terms of the Settlement strongly favors final approval. *See, e.g.*, *Stapleton*, 236 Ill. App. 3d at 497 ("The fact that only 26 of 590,000 members elected to opt-out is testimony . . . that the class believes the settlement is fair."); *In re Mex. Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1021 (N.D. Ill. 2000) (stating that

---

[3] *See, e.g.*, *Hashw v. Dep't Stores Nat'l Bank*, 182 F. Supp. 3d 935, 942 (D. Minn. 2016) (final approval of class action settlement granted where class size was estimated); *In re Mexico Money Transfer Litig. (W. Union & Valuta)*, 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000), *aff'd sub nom. In re Mexico Money Transfer Litig.*, 267 F.3d 743 (7th Cir. 2001) (approving class action settlement even though it was "not possible to estimate the class size precisely"); *Hamid v. Blatt, Hasenmiller, Leibsker, Moore & Pellettieri*, No. 00 C 4511, 2001 WL 1543516, at *3 (N.D. Ill. Nov. 30, 2001) (recognizing that you can estimate the class size) (citing *Long v. Thornton Township High Sch. Dist.*, 82 F.R.D. 186, 189 (N.D. Ill. 1979)); *Fitzgerald v. Schweiker*, 538 F. Supp. 992, 1000 (D. Md. 1982) ("Where it is difficult to determine class size with precision, plaintiff need make only a reasonable estimate of the number of class members.").

acceptance rate of 99.9% of class members "is strong circumstantial evidence in favor of the settlements").

After extensive notice, 59,958 Settlement Class members submitted Claim Forms. (Castillejos Decl., ¶ 15). This amounts to a **4% claims rate**,[4] which is not unusual in class action settlements and is within an acceptable range for approval. *Pollard v. Remington Arms Co., LLC*, 896 F.3d 900, 906 (8th Cir. 2018) (approving a settlement with a **0.29% claims rate** after notice plan was executed that included email to approximately one million individuals and postcard mailings to approximately 93,000 individuals for whom defendant had a mailing address but no email address); *Poertner v. Gillette Co.*, 618 F. App'x 624, 625 (11th Cir. 2015) (approving a settlement with a **0.76% claims rate** after "class notice was provided by publication through national periodicals and popular internet outlets."); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944-45 (9th Cir. 2015) (approving settlement with a **less than 4% claims rate**); *White v. Experian Info. Solutions, Inc.*, 803 F. Supp. 2d 1086, 1100 (C.D. Cal. 2011) (the **5% claims rate** "does not mean that the Settlement, on the whole, is not fair, reasonable and adequate."); *Touhey v. United States*, No. EDCV 08-01418-VAP, 2011 WL 3179036, at *7–8 (C.D. Cal. July 25, 2011) (finding that **2% claims rate** did not militate against final approval because, inter alia, settlement was fair to class members); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, No. MDL 1532, 2011 WL 1398485, at *3 (D. Me. Apr. 13, 2011), suppl., 800 F. Supp. 2d 328 (D. Me. 2011), and aff'd, No. 2:03-MD-1532-DBH, 2012 WL 379947 (D. Me. Feb. 3, 2012) (finding favorable class reaction in a **3.9% claims rate**—438,169 claims out of 11.3 million eligible claimants); *In re TJX Cos. Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 397, 406 (D. Mass. 2008) (approving entire amount of attorneys' fees request after previously approving data breach

---

[4] 59,958 claims divided by an estimated 1,500,000 Settlement Class Members equals 4%.

settlement with **claims rate of slightly more than 3%**); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 370 F. Supp. 2d 320, 321 (D. Me. 2005) (noting prior approval of settlement that yielded **2% claims rate**); *Strong v. BellSouth Telcoms., Inc.*, 173 F.R.D. 167, 169, 172 (W.D. La. 1997) (noting prior approval of settlement that yielded **4.3% claims rate**); *Shames v. Hertz Corp.*, No. 07-CV-2174-MMA WMC, 2012 WL 5392159, at *14 (S.D. Cal. Nov. 5, 2012) (granting final approval of a class action settlement with a **4.9% claims rate**); *Forcellati v. Hyland's, Inc.*, No. CV 12-1983-GHK (MRWx), 2014 WL 1410264, at *6 (C.D. Cal. Apr. 9, 2014) ("The reality is the number of class members who actually file claims is relatively low": "3-5 percent" (citation omitted)); *Montoya v. PNC Bank, N.A.*, No. 14-20474-CIV, 2016 WL 1529902, at *22 (S.D. Fla. Apr. 13, 2016) ("class settlements featuring low claims rates are routinely approved.").

Many factors contribute to the claims response rate that have nothing to do with the adequacy of the notice or the relief provided in the settlement. *In re Serzone Prod. Liab. Litig.*, 231 F.R.D. 221, 235–36 (S.D.W. Va. 2005) (noting that class members may choose to not participate in a settlement because they do not feel aggrieved) ("As Mr. Hilsee explained in his supplemental affidavit, the adequacy of notice is measured by whether notice reached Class Members and gave them an opportunity to participate, not by actual participation."); *Pollard v. Remington Arms Co., LLC*, 320 F.R.D. 198, 215 (W.D. Mo. 2017), *aff'd*, 896 F.3d 900 (8th Cir. 2018) (noting that the claims rate does not dictate whether the notice provided was the best notice practicable under the circumstances, and does not govern whether the settlement is fair, reasonable, or adequate).

There were **48,956 Claim Forms submitted for Category 1** (for whom the Agreement provided a one-time payment of approximately $10.00 to any person who made a purchase using

a credit or debit card at one of the 325 Impacted Sonic Drive-In locations during the period of time from April 7, 2017 through October 28, 2017) (Castillejos Decl., ¶ 16), and **11,002 Claim Forms submitted for Category 2** (for whom the Agreement provided a one-time payment of approximately $40.00 to any person who: (i) made a purchase using a credit or debit card at one of the 325 Impacted Sonic Drive-In locations during the period of time from April 7, 2017 through October 28, 2017, and (ii) experienced a fraudulent or unauthorized charge on the credit or debit card account used at the Impacted Sonic Drive-In location any time thereafter up through February 28, 2018) (Castillejos Decl., ¶ 16). The Agreement provides that the Settlement Administrator will adjust the amounts of the payments to Settlement Class Members by decreasing or increasing them on a *pro rata* (proportionate) basis such that the total aggregate amount of Verified Claims to be paid does not exceed the Net Settlement Fund or, alternatively, in order to fully allocate and pay to Settlement Class Members the full Net Settlement Fund so that no money remains in the Settlement Fund. (SA, ¶ 3.1.6.). No monies will revert to the Sonic Defendants. *Id.*

The "Net Settlement Fund" will be distributed to Settlement Class Members who submit Verified Claims. (SA, ¶ 3.1.5.) The "Net Settlement Fund" is the amount remaining from the $4,325,000 Settlement Fund after deducting the estimated costs of Notice ($64,000) and Settlement Administration ($142,674), and the amounts requested in the Fee Petition for Plaintiffs' counsel's attorneys' fees ($1,441,666.67), litigation costs and expenses ($311,693.53), service awards to the nine Representative Plaintiffs ($15,500 total), and individual payments to the thirteen Individual Named Plaintiffs ($26,500 total). (Castillejos Decl. ¶ 17). *See also* Dkt. No. 157, Plaintiffs' Amended Motion for Attorneys' Fees, Costs and Expenses, Service Awards for Representative Plaintiffs, and Individual Payments to Individual Named Plaintiffs ("Fee Petition").

If the amounts are awarded in the amounts requested in the Fee Petition, then the Net Settlement Fund will be approximately $2,322,965.80.

Based on the forgoing assumption, the Settlement Administrator estimates that the average payout to each Category 1 Class Member will be *increased* **on a** *pro rata* **basis to $24.99**, and the average payout to each Category 2 Class Member will be *increased* **on a** *pro rata* **basis to $99.95**.[5] (Castillejos Decl., ¶ 17). Settlement Class Members who submitted claims will be receiving a **250%** *pro rata* **increase** in the amount of the settlement payments.[6]

## IV. THE COURT SHOULD GRANT FINAL APPROVAL OF THE PROPOSED SETTLEMENT

"Being a preferred means of dispute resolution, there is a strong presumption by courts in favor of settlement." *In re Telectronics Pacing Systems, Inc.*, 137 F. Supp. 2d 985, 1008-09 (S.D. Ohio 2001) (citing *In re Southern Ohio Correctional Facility,* 173 F.R.D. 205, 211 (S.D. Ohio 1997)); *In re Rio Hair Naturalizer Prod. Litig.,* 1996 WL 780512, at *11 (E.D. Mich. Dec. 20, 1996); *Parker v. Anderson,* 667 F.2d 1204, 1209 (1982); *Manual for Complex Litigation,* § 30.42 (3d ed.1995). "To determine whether a proposed settlement is fair, reasonable, and adequate, the court must determine whether the interests of the class are better served by the settlement than by future litigation." *Manual for Complex Litigation (Fourth)*, § 21.61 (2004); *see*

---

[5] The Settlement Administrator's calculations are based on attorneys' fees, litigation expenses, service awards to Representative Plaintiffs, and individual payments to Individual Plaintiffs being awarded in the amounts requested in the Fee Petition.

[6] The 250% *pro rata* increase is calculated based on the increase from the $10 payout to each Category 1 Class Member (set forth in the Settlement Agreement and Notice) to the $24.99 estimated payout to each Category 1 Class Member; and the increase from the $40 payout to each Category 1 Class Member (set forth in the Settlement Agreement and Notice) to the $99.95 estimated payout to each Category 2 Class Member.

*also* Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure: Civil 2d*, § 1797.1 (2d ed. 1986).

"Given that class settlements are favored, the role of the district court is 'limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.'" *IUE-CWA v. General Motors Corp.*, 238 F.R.D. 583, 594 (E.D. Mich. 2006) (quoting *UAW v. General Motors Co.,* 2006 WL 891151, *13 (Mar. 1, 2006)); *see also* Wright & Miller, Federal Practice & Procedure § 1797.5 ("The role of the judge at the settlement hearing is strictly limited"). "Absent evidence of fraud or collusion, such settlements are not to be trifled with." *Granada Investments, Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992).

Here, there has been no evidence—nor has there been an allegation—that the Agreement is the product of fraud or collusion, and the Court should approve the Agreement.  As set forth herein, the Agreement is fair, reasonable, and adequate because it provides significant monetary benefits to Settlement Class Members without the risks and burdens of continued litigation. The positive results of the Settlement warrant that final approval should be granted.

### A.    The *Gascho* Factors Weigh in Favor of Granting Final Approval.

In *Gascho*, the Sixth Circuit has held that seven (7) factors should "guide the court's inquiry" in determining whether a class action settlement should be approved: (1) "the risk of fraud or collusion;" (2) the "complexity, expense and likely duration of the litigation;" (3) the "amount of discovery engaged in by the parties;" (4) the "likelihood of success on the merits;" (5) the "opinions of class counsel and class representatives;" (6) the "reaction of absent class members;" and (7) "the public interest." *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 276-77 (6th

Cir. 2016), *cert. denied*, 137 S. Ct. 1065 (2017) (quoting *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp.,* 497 F.3d 615, 631 (6th Cir. 2007)).  Here, all seven (7) *Gascho* factors support approving the Settlement.

### 1.    The Absence of Fraud or Collusion Supports Approving the Amended Settlement Agreement.

The first factor that the Court should consider in determining whether to grant final approval of the Settlement is the risk of fraud or collusion. *See Gascho*, 822 F.3d at 276-77. "Courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered." *Int'l Union v. Ford Motor Co.*, 2006 WL 1984363, at *26 (E.D. Mich. July 13, 2006); *see also IUE*, 238 F.R.D. at 598 ("Courts presume the absence of fraud or collusion unless there is evidence to the contrary.").

Here, the terms of the Settlement were negotiated at a mediation presided over by the Honorable Magistrate Judge Jonathan D. Greenberg. Further, there has been ***no*** allegation of fraud or collusion against any of the Parties, and the absence of any such allegations supports approval of the Agreement.  *See Thacker v. Chesapeake Appalachia*, L.L.C., 695 F. Supp. 2d 521, 531 (E.D. Ky. 2010) ("Throughout this litigation no allegation of fraud or collusion has ever been made against the parties."). The Agreement was the result of arm's-length negotiations between the Parties, informal discovery, and two formal mediation sessions before Magistrate Judge Greenberg. The fact that the material terms of the Agreement were reached during this formal mediation is evidence that the settlement is ***not*** the product of any fraud or collusion. *See Gascho*, 822 F.3d at 277 (finding that a case's procedural history, including a "formal mediation session…weighed against the possibility of fraud or collusion."). As such, the Court should find that the Settlement was not reached through any fraud or collusion, and this first factor weighs in favor of approving the Agreement.

2.      **The Complexity, Time, and Expense of Continued Litigation Against the Defendant Supports Approving the Amended Settlement Agreement.**

The second factor is the complexity, time, and expense of continued litigation against the Defendant. *See Gascho*, 822 F.3d at 276-77.  "Although this factor requires 'some evaluation of the merits of the dispute, the district court must refrain from reaching conclusions upon issues which have not been fully litigated.'" *IUE-CWA*, 238 F.R.D. at 595 (quoting *Berry v. School Dist. of City of Benton Harbor*, 184 F.R.D. 93, 98 (W.D. Mich. 1998)) (additional citations omitted).

 No matter how meritorious a plaintiff's claim may be, "there is no such thing as risk-free, expense-free litigation." *Id.* at 596. "Generally speaking, '[m]ost class actions are inherently complex and settlement avoids the costs, delays, and multitude of other problems associated with them.'" *In re Telectronics*, 137 F. Supp. 2d at 1013 (quoting *In re Austrian & German Bank Holocaust Litig.,* 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000)). This case is no exception, as the issues are hotly contested in this Litigation and the outcome is uncertain. Sonic's motion to dismiss argued that Plaintiffs did not suffer an actionable concrete injury as a result of the Data Breach and failed to establish an elevated or imminent risk of future injury. (Dkt. No. 39-1.) Sonic argued that Plaintiffs who alleged they made credit or debit card purchases during the Class Period at the Impacted Sonic Drive-Ins did not experience any fraudulent charges (*e.g.*, Plaintiff Pearson), or did not suffer any unreimbursed fraudulent charges or out-of-pocket expenses (*e.g.*, Plaintiffs Gilmore and MacKay) as a result of the Data Breach. (Dkt. No. 39-1, pgs. 6-8.) Sonic further asserted that the other types of injury that Plaintiffs allege they suffered are not sufficient to create Article III standing. (Dkt. No. 39-1, pgs. 8-11.) Lastly, Sonic argued that Plaintiffs failed to establish an elevated or imminent risk of future injury. (Dkt. No. 39-1, pgs. 12-13; *see also* Dkt.

No. 79, pgs. 16-17, arguing that the type of credit and debit card information stolen here is not the type that generally can be used alone to open unauthorized new accounts).

Plaintiffs allege that they have suffered a variety of harms as a result of the Data Breach, including unauthorized charges, loss of their personal and financial information, loss of use of funds, time spent, increased risk of fraud and identity theft, diminution in value of their personal data, and money paid to Sonic that they would not have paid had they known Sonic did not keep their data secure. (Dkt. No. 73-1, pgs. 7-11.)

Thus, while Plaintiffs believe in the strength of their case, there is no guarantee that Plaintiffs would be successful. *See generally* Timothy H. Madden, *Data Breach Class Action Litigation—A Tough Road for Plaintiffs*, BOSTON BAR J., Fall 2011, at 27; Matthew J. Schwartz, *Why so Many Data Breach Lawsuits Fail*, Bank Info Security, 05/11/2015, https://www.bankinfosecurity.com/data-breach-lawsuits-fail-a-8213 (last visited Jun. 26, 2019). The Court never decided Sonic's motion to dismiss before the Plaintiffs filed their Second Amended Consolidated Class Action Complaint on July 27, 2018. If not for the Settlement, Sonic would certainly continue to argue, *inter alia*, that Plaintiffs have not shown any cognizable injury or damages as a result of the Data Breach. The litigation is significantly complex and presents many substantial risks and uncertainties that could have prevented any recovery whatsoever. To contrast, the Agreement provides Class Members with monetary compensation for these harms without the burden of having to prove-up their damages.

The Agreement delivers a real and substantial remedy to the Settlement Class without the risk or delay inherent in prosecuting Plaintiffs' claims against Defendant through summary judgment, determination of class certification, trial, and appeal. Settlement Class Members will benefit by receiving immediate compensation under the Agreement, rather than undergoing years

of burdensome and uncertain litigation. *See Gilbert v. Abercrombie & Fitch, Co.*, 2016 WL 4159682, at \*9 (S.D. Ohio Aug. 5, 2016), *report and recommendation adopted,* 2016 WL 4449709 (S.D. Ohio Aug. 24, 2016) ("In the absence of a settlement, continued litigation would span years, requiring fact discovery, expert discovery, formal class certification, and other motion practice, including post-trial motions and appeals; that litigation would be both extensive and costly....Consideration of this factor therefore weighs in favor of approving the *Stipulation and Settlement Agreement*."); *In re Austrian and German Bank*, 80 F. Supp. 2d at 174 (recognizing that "[m]ost class actions are inherently complex and settlement avoids the costs, delays, and multitude of other problems associated with them").

Thus, this factor favors final approval of the Settlement. *See Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) ("There are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation."); *In re Sunrise Sec. Litig.*, 131 F.R.D. 450, 455 (E.D. Pa. 1990) (approving a class action settlement because, in part, the settlement "will alleviate…the extraordinary complexity, expense and likely duration of this litigation").

### 3.    The Extensive Discovery Engaged in by the Parties Supports Approving the Amended Settlement Agreement.

The third factor is the amount of discovery engaged in by the Parties.  *See Gascho*, 822 F.3d at 276-77.  Whether the parties engage in formal discovery practice, or whether the parties exchange informal discovery, Courts have explained that "the pertinent inquiry is what facts and information have been provided." *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 967 (N.D. Ill. 2011); *see also McBean v. City of New York*, 233 F.R.D. 377, 384-85 (S.D.N.Y. 2006); *In re Elan Secs. Litig.*, 385 F. Supp. 2d 363, 370 (S.D.N.Y. 2005).

Throughout the Litigation, the Parties engaged in substantial discovery. As part of the discovery process, Class Counsel: negotiated the protective order regarding confidential materials (Dkt. No. 67); prepared and served detailed document requests and interrogatories on the Sonic Defendants; prepared and served twenty (20) subpoenas *duces tecum* on third parties (*see, e.g.*, Plaintiffs' Notice of Intent to Serve Third Parties, Dkt. Nos. 32, 36, 37, 38, 64, 66, 77, 92); engaged in numerous meet and confers with Sonic and third parties concerning the scope of document productions, ESI protocols, search terms, and document custodians; responded to the Sonic Defendants' requests for production and interrogatories, including gathering and producing responsive documents from numerous of the Representative Plaintiffs and Individual Named Plaintiffs; defended the depositions of Plaintiffs Cornelius Bogard, John Dolembo, Dometric Pearson, Megan MacKay, Denise Ramirez, and Septabeya Bean; prepared for and deposed Mark Davis, who was Sonic's Vice President of Cybersecurity and Enterprise Systems during the Class Period; obtained evidentiary affidavits, in lieu of depositions, from third party vendors addressing their role in Sonic's information technology and cybersecurity systems and processes; prepared and issued several letters to Defense Counsel concerning document production and other discovery issues; filed motions against Sonic and third parties First Data Corporation, Oracle Hospitality, Inc., SCI Group, LLC, ServiceNow, and Texas P.O.S. to compel the production of documents (Dkt. No. 81) and argued those motions before the Court; filed an opposition to Sonic's motion for protective order relating to production by third-party CoalFire Systems, Inc. (Dkt. No. 88); filed an opposition to Sonic's motion to compel initial disclosures (Dkt. No. 41) and argued against that motion in a hearing before the Magistrate Judge; reviewed and analyzed more than 130,000 pages of documents produced by Sonic and third parties; interviewed several former Sonic

employees identified by Sonic as having relevant knowledge; and retained and consulted with multiple experts, including cybersecurity experts and damages experts.

Class Counsel were well-informed of the important facts and relevant legal issues when negotiating the Settlement. Through both formal and informal discovery during the mediation, Class Counsel learned additional facts relating to how the Data Breach occurred, how the breach was contained, how it was determined which stores were affected, and the potential size of the Class. Indeed, the Parties exchanged sufficient information for Plaintiffs and Class Counsel to evaluate the Parties' relative positions, and this was presented to Magistrate Judge Greenberg during the mediation. Accordingly, this factor favors also weighs in favor of approving the Agreement.

> ### 4. The Relief Obtained by the Settlement, Weighed Against the Likelihood of Success on the Merits, Supports Approving the Amended Settlement Agreement.

The fourth factor is the likelihood of success on the merits weighed against the relief obtained by the settlement. *See Gascho*, 822 F.3d at 276-77; *see also Int'l Union, United Auto., Aerospace, and Agr. Implement Workers*, 497 F.3d at 631 (recognizing that a court "cannot judge the fairness of a proposed compromise without weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." (internal quotation marks and citations omitted)). This factor also weighs in favor of approving the Agreement.

Generally, class action settlements are favorable to courts because "[e]xperience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict[.]" *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003). Therefore, settlements can still be fair, reasonable, adequate, and worthy of court approval when they do not provide the full relief that may be awarded at trial. *See Priddy v. Edelman*, 883

F.2d 438, 447 (6th Cir. 1989) ("The fact that the plaintiff might have received more if the case had been fully litigated is no reason not to approve the settlement.").

The monetary benefits offered to Settlement Class Members are fair and reasonable in light of reported average out-of-pocket expenses attributable to a data breach. According to *The Aftermath of a Data Breach: Consumer Settlement (April 2014)*, which summarizes a research study sponsored by Experian Data Breach Resolution and conducted and reported by Ponemon Institute, "[e]ighty-one percent of respondents who were victims of a data breach did not have any out-of-pocket costs," and nine percent had less than $10 in out-of-pocket costs. (*See* **Exhibit 2**, pgs. 7, 18, attached hereto). Further, for those respondents who incurred out-of-pocket costs, the average amount was $38.00. *Id.* at 7. As explained herein, Settlement Class Members who submitted claims will be receiving a 250% *pro rata* increase in the amount of the settlement payments. Settlement Class members who made a purchase during the Class Period will be receiving a $24.99 payment instead of the estimated $10 payment set forth in the Agreement, and Settlement Class Members who sustained a financial compromise of their personal information will be receiving a $99.95 payment instead of the estimated $40 payment set forth in the Agreement. The $99.95 payment to Settlement Class Members who sustained a financial compromise of their personal information is 2½ times the average amount of out-of-pocket costs incurred by the respondents who incurred out-of-pocket costs in the Ponemon report; thus, this Settlement provides these Settlement Class Members with compensation for other, non-monetary damages, such as their time spent dealing with the issues stemming from Sonic's data breach. *See* **Exhibit 2**.

With regard to non-monetary benefits, Sonic has acknowledged that it made certain governance changes since the filing of the Litigation, and has agreed to continue using and

employing the data security practices outlined in Paragraph 3.4 of the Agreement for a period of no less than three (3) years following the Effective Date of the Settlement. (SA, ¶ 3.3.)

While Class Counsel is confident in the strength of Plaintiffs' and Settlement Class Members' claims, the aforementioned complex issues involved in this litigation set forth above (*see* Section IV.B.2) posed a risk of no recovery whatsoever. As such, Settlement Class Members will benefit from receiving compensation through the Agreement now without assuming the risks of trial and the burden of continued litigation.

### 5. The Opinions of Class Counsel and Class Representatives Support Approving the Amended Settlement Agreement.

The sixth factor is the opinions of Class Counsel and the Class Representatives. *See Gascho*, 822 F.3d at 276-77. Courts repeatedly and explicitly defer to the judgment of experienced counsel who have conducted arm's-length negotiations in approving proposed class settlements. *See, e.g.*, *Blank v. Talley Industries, Inc.*, 64 F.R.D. 125, 132 (S.D. N.Y. 1974) (recognizing that a factor "entitled to substantial weight is that the settlement bears the imprimatur of seasoned and experienced counsel"); *Fisher Brothers v. Phelps Dodge Industries Inc.*, 604 F. Supp. 446, 452 (E.D. Pa. 1985) (finding "the professional judgment of counsel involved in the litigation is entitled to great weight"); *see also Gascho*, 822 F.3d at 277 (finding the fact that "Class counsel and representatives approved the settlement agreement" weighed in favor of granting final approval).

Plaintiffs' Unanimous and Unopposed Motion for Appointment of Interim Lead Counsel and Steering Committee details the background, education, experience, credentials, and the caliber of Class Counsel and their respective law firms. (Dkt. No. 4). As fully set forth therein, Class Counsel has extensive experience in consumer class actions and complex litigation, and their opinion regarding the fairness and adequacy of the Settlement is very credible. Additionally, Class Counsel's opinion is supported by the amount of work that they spent investigating Plaintiffs' and

Settlement Class Members' claims. After arm's-length negotiations, including two formal mediation sessions, the Parties reached an agreement that Class Counsel believes to be an excellent outcome for Settlement Class Members. Class Counsel's opinion regarding the Agreement should be given significant weight with the Court.

Regarding the opinions of the Representative Plaintiffs and Individual Plaintiffs, the Fee Petition sets forth their extensive involvement in this litigation, some of whom attended a settlement conference and/or telephonic conference with the Court, answered discovery, appeared for a deposition, and/or otherwise assisted in the prosecution of this litigation. (*See* Memorandum in Support of Fee Petition, Dkt. No. 157-1, pgs. 16-18). As such, they have an adequate understanding of the strengths and weaknesses of their case, and the Court should give weight to their approval of the Agreement.

Class Counsel, Representative Plaintiffs and Individual Plaintiffs have brought this Motion for Final Approval because they support that the Agreement is a fair, reasonable, and adequate result for Settlement Class Members. Therefore, this factor weighs in favor of approving the Agreement.

> **6. The Reaction of Absent Settlement Class Members Support Approving the Amended Settlement Agreement.**

The sixth factor is the reaction of absent class members. *Gascho*, 822 F.3d at 276-77. Settlement Class Members have responded incredibly well to the Agreement.

*No* Settlement Class Member objected to the Settlement, and *no* Settlement Class Member opted out of the Settlement. (Castillejos Decl., ¶¶ 13-14). The absence of objections and of opt-outs strongly supports the fairness and reasonableness of the Settlement here. *See, e.g.*, *GMAC Mortg. Corp. v. Stapleton*, 236 Ill. App. 3d 486, 497 (1st Dist. 1992) ("The fact that only 26 of 590,000 members elected to opt-out is testimony…that the class believes the settlement is fair.");

*In re Mex. Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1021 (N.D. Ill. 2000) (stating that acceptance rate of 99.9% of class members "is strong circumstantial evidence in favor of the settlements"); *Goldsmith v. Tech. Solutions, Co*., 1995 WL 17009594, at *5 (N.D. Ill. Oct. 10, 1995) ("not a single objection to the proposed settlement has been received from any class member. Such a positive response to the settlement by the class is strong evidence the settlement is fair, reasonable and adequate, and should be approved.") (internal citations omitted); *Myszka v. National Collegiate Scouting Ass'n, Inc*., 2014 WL 1364468, at *1 (N.D. Ill. Mar. 19, 2014) (finding that the complete lack of objections to the settlement supports final approval); *Aboudi v. T-Mobile USA, Inc*., 2015 WL 4923602, at *6 (S.D. Cal. Aug. 18, 2015) ("The reaction of Class Members can be characterized as positive. No objections have been filed, and there have been only 2 requests for exclusion."); *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010) (finding that 4.86% opt-out rate strongly supported approval); *Churchill Vill., LLC v. Gen. Elec*, 361 F.3d 566, 577 (9th Cir. 2004) (approving a settlement with 500 opt-outs from a 90,000-person class, representing 0.56% of the class).

**Here, as there were no opt outs or objections, there was an acceptance rate of 100% of Settlement Class Members**. The Court can easily infer that absent Settlement Class Members approve of the Settlement and its terms based on this tremendous response. *See Coulter-Owens v. Rodale, Inc.*, 2016 WL 5476490, at *4 (E.D. Mich. Sept. 29, 2016) ("Absent class members have not given this court any reason to question the fairness of this settlement. None have lodged any objections with this court, and at the time of the motion's filing, only three had requested exclusion from the class.").

As such, the reaction of absent Settlement Class Members supports approving the Agreement.

**7.      The Public Interest Supports Approving the Amended Settlement Agreement.**

The seventh and final factor for the Court's consideration is the public interest. *See Gascho*, 822 F.3d at 276-77. This factor similarly weighs in favor of approving the Agreement.

"[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources." *In re Cardizem CD*, 218 F.R.D. at 530; *see also Gascho*, 822 F.3d at 277 ("The public interest favored settlement because it provided an immediate cash payout to class members for their compensable injuries in an amount the court found to be fair, reasonable, and adequate, and because settlement would conserve judicial resources."); *Hainey v. Parrott*, 617 F. Supp. 2d 668, 679 (S.D. Ohio 2007) ("Public policy generally favors settlement of class action lawsuits.").

This case is no exception, and the public interest is served by the Agreement.  The Settlement provides significant monetary benefits to Settlement Class Members without the risks or burdens of continued litigation, and it conserves the resources of the Parties' and the Court. Additionally, the public interest supports that Class Members should be compensated for harms resulting from Defendant's failure to protect their personal information.

Further, the fact that no Settlement Class Member objected to the Settlement further supports that the public interest is in favor of the Settlement. *See Coulter-Owens*, 2016 WL 5476490 at *4 ("Nothing in the record suggests a contrary public interest at play, and no class member has challenged the settlement.").

As such, all seven (7) *Gascho* factors weigh in favor of approving the Agreement. The Settlement is fair, reasonable, and adequate, and the Court should grant final approval of the Agreement.

## V.     CONCLUSION

For all the reasons set forth above, Representative Plaintiffs, individually and as representatives of the Settlement Class, and Individual Plaintiffs request that the Court grant final approval of the Agreement, and for any other relief that the Court deems just under the circumstances (draft order attached hereto as **Exhibit 3**).

Date: June 28, 2019                                   Respectfully submitted,

                                                      /s/ *William B. Federman*
                                                      William B. Federman
                                                      FEDERMAN & SHERWOOD
                                                      10205 N. Pennsylvania Ave.
                                                      Oklahoma City, OK 73120
                                                      Telephone:  (405) 235-1560
                                                      Facsimile:   (405) 239-2112
                                                      wbf@federmanlaw.com
                                                      clm@federmanlaw.com

                                                      *Interim Lead Counsel for Plaintiffs*

                                                      Marc E. Dann (0039425)
                                                      DANN LAW
                                                      P.O. Box 6031040
                                                      Cleveland, OH 44103
                                                      Telephone: (216) 373-0539
                                                      Facsimile:  (216) 373-0536
                                                      mdann@dannlaw.com

                                                      *Interim Liaison Counsel*

                                                      Thomas A. Zimmerman, Jr.
                                                      ZIMMERMAN LAW OFFICES, P.C.
                                                      77 W. Washington Street, Suite 1220
                                                      Chicago, Illinois 60602
                                                      Telephone: (312) 440-0020
                                                      Facsimile:  (312) 440-4180
                                                      tom@attorneyzim.com

                                                      Melissa R. Emert
                                                      STULL, STULL, & BRODY
                                                      6 East 45th Street
                                                      New York, NY 10017

Telephone: (954) 341-5561
Facsimile:  (954) 341-5531
memert@ssbny.com

Michael Fuller
OLSEN DAINES
US Bancorp Tower
111 Southwest 5th Ave, Suite 3150
Portland, Oregon 97204
Telephone: (503) 222-2000
Facsimile:  (503) 362-1375
michael@underdoglawyer.com

Miles N. Clark
KNEPPER & CLARK LLC
10040 W. Cheyenne Ave., Suite 170-109
Las Vegas, NV 89129
Telephone:  (702) 825-6060
Facsimile:  (702) 447-8048
miles.clark@knepperclark.com

*Plaintiffs' Steering Committee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 28, 2019, a copy of the foregoing was served via ECF upon the following counsel for Defendants:

Kari M. Rollins
Sheppard Mullin Richter & Hampton LLP
30 Rockefeller Plaza
New York, NY 10112
krollins@sheppardmullin.com

Craig C. Cardon
Sheppard Mullin Richter & Hampton LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
ccardon@sheppardmullin.com

Lisa Thomas
David M. Poell
Sheppard Mullin Richter & Hampton LLP
Three First National Plaza
70 West Madison Street, 48th Floor
Chicago, IL 60602
lmthomas@sheppardmullin.com
dpoell@sheppardmullin.com

David A. Riepenhoff
Melanie J. Williamson
Fishel Hass Kim Albrecht Downey LLP
7775 Walton Parkway, Suite 200
New Albany, OH 43054
driepenhoff@fishelhass.com
mwilliamson@fishelhass.com

/s/ *William B. Federman*
William B. Federman
*Interim Lead Counsel for Plaintiffs*