**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION AT CLEVELAND**

| | | |
|---|---|---|
| | ) | |
| IN RE: SONIC CORP. CUSTOMER DATA | ) | MDL Case No. 1:17-md-02807-JSG |
| BREACH LITIGATION | ) | |
| (Financial Institutions) | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO ALL | ) | |
| FINANCIAL INSTITUTION ACTIONS | ) | |
| | ) | |

**CLASS REPRESENTATIVES' MEMORANDUM OF LAW IN SUPPORT OF CLASS
REPRESENTATIVES' MOTION FOR FINAL APPROVAL OF CLASS ACTION
SETTLEMENT**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................3

I.      Summary of the Extensive and Lengthy Litigation History ................................3

II.     The Parties' Class Action Settlement Agreement and Preliminary Approval...................6

III.    KCC Properly Administered the Settlement Agreement ................................8

        A.      Notice Issued Pursuant to the Settlement Agreement................................8

        B.      The Class's Reception of the Settlement Agreement—Claims, Opt Outs, and
                Objections ..........................................................................8

        C.      The Administrator Carried Out Its Duties Under the Settlement ...........................9

        D.      Plaintiffs' Motion for Attorneys' Fees and Expenses and Class Representative
                Service Awards ....................................................................9

ARGUMENT ....................................................................................................................10

I.      The Court Should Grant Final Approval of the Settlement ................................10

        A.      The Settlement Is Free from Fraud and Collusion................................11

        B.      The Complexity, Expense, and Duration of the Litigation Support Final
                Approval ..........................................................................13

        C.      The Parties Conducted Substantial Discovery throughout the Litigation..............14

        D.      The Settlement's Benefits are Fair, Adequate, and Reasonable Given the
                Significant Risk of Continued Litigation................................15

                i.      Plaintiffs Face Significant Risk Should Litigation Continue....................16

                ii.     The Settlement's Benefits Compare Favorably to the Risks of
                        Continued Litigation ................................................17

        E.      Class Counsel and the Class Representatives Support the Settlement ................19

        F.      The Class Reacted Positively to the Settlement Agreement.................................21

        G.      The Settlement Agreement is in the Public Interest................................23

II.     Notice to the Class Satisfied Fed. R. Civ. P. 23(e) ............................................................24

CONCLUSION ...................................................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Ball v. Kasich*,
  No. 2:16-cv-0282, 2020 WL 1969289 (S.D. Ohio, Apr. 24, 2020) ............................ 11, 16, 23

*Bartell v. LTF Club Operations Co., Inc.*,
  No. 2:14-cv-0401, 2020 WL 7062834 (S.D. Ohio Aug. 7. 2020) .............................. 14, 16, 19

*Borders v. Alternative Solution Health Network, LLC*,
  No. 2:20-v-1273, 2021 WL 4868512 (S.D. Ohio May 17, 2021) ........................................... 22

*Doe v. Ohio*,
  No. 2:91-cv-0464, 2020 WL 728276 (S.D. Ohio Feb. 12, 2020) .................................... passim

*Fidel v. Farley*,
  534 F.3d 508 (6th Cir. 2008) ........................................................................................... 24

*Granada Investments, Inc. v. DWG Corp.*,
  962 F.2d 1203 (6th Cir. 1992) ......................................................................................... 10

*Grunin v. Int'l House of Pancakes*,
  513 F.2d 114 (8th Cir. 1975) ........................................................................................... 25

*In re Anthem, Inc. Data Breach Litig.*,
  327 F.R.D. 299 (N.D. Cal. Aug. 15, 2018) ...................................................................... 19

*In re Arby's Rest. Grp., Inc. Data Sec. Litig.*,
  No. 1:17-cv-0514 (N.D. Ga. Nov. 20, 2020) .................................................................... 19

*In re Arby's Rest. Grp., Inc. Data Sec. Litig.*,
  No. 1:17-cv-1035-WMR (N.D. Ga. June 6, 2019) ........................................................... 19

*In re Austrian & German Bank Holocaust Litig.*,
  80 F. Supp. 2d 164 (S.D.N.Y. 2000) ............................................................................... 21

*In re Broadwing, Inc. ERISA Litig.*,
  252 F.R.D. 369 (S.D. Ohio 2006) .................................................................................... 14

*In re Cardizem CD Antitrust Litig.*,
  218 F.R.D. 508 (E.D. Mich. 2003) .................................................................................. 21

*In re Community Health Sys.*,
  No.: 15-CV-222-KOB (N.D. Ala. Aug. 22, 2019) ........................................................... 19

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*,
   No. 3:08-cv-1998, 2009 WL 5184352 (W.D. Ky. Dec. 22, 2009) .......................................... 24

*In re Gen. Tire & Rubber Co. Sec. Litig.*,
   726 F.2d 1075 (6th Cir. 2016) ....................................................................................... 15

*In re Packaged Ice Antitrust Litig.*,
   No. 17-md-2137, 2018 WL 4520931 (6th Cir. 2018) ............................................................. 11

*In re Polyurethane Foam Antitrust Litig.*,
   No. 10-md-2196, 2012 WL 12868246 (N.D. Ohio Jan. 23, 2012) ................................... 10, 11

*In re Whirlpool Corp. Front-loading Washer Prods. Liab. Litig.*,
   1:08-WP-65000, 2016 WL 5338012 (N.D. Ohio Sept. 23, 2016) ..................................... passim

*Karkoukli's Inc. v. Dohany*,
   409 F.3d 279 (6th Cir. 2005) ......................................................................................... 24

*Kritzer v. Safelite Solutions, LLC*,
   No. 2:20-cv-0729, 2012 WL 1945144, at *7 ..................................................................... 20

*Loos v. Saint-Gobain Abrasives, Inc*.,
   No. 15-cv-0411, 2016 WL 5017335 (W.D. Okla. Sept. 19, 2016) ...................................... 17

*Mitcham v. Intrepid U.S.A., Inc.*,
   No. 3:17-cv-0703, 2019 WL 2269918 (W.D. Ky. May 28, 2019) ........................................ 25

*Moulton v. United States Steel Corp.*,
   581 F.3d 344 (6th Cir. 2009) ......................................................................................... 12

*Priddy v. Edelman*,
   883 F.2d 438 (6th Cir. 1989) ......................................................................................... 12

*Rotondo v. JPMorgan Chase Bank, N.A.*,
   No. 2:19-cv-2328, 2019 WL 6167086 (S.D. Ohio Nov. 20, 2019) ...................................... 22

*Satterly v. Airstream Inc.*,
   No 3:19-cv-0032, 2020 WL 6536342 (S.D. Ohio Sept. 25, 2020) ...................................... 14

*Shames v. Hertz Corp*.,
   07-cv-2174, 2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) ................................................... 22

*Stinson v. Delta Mgmt. Assocs.*,
   302 F.R.D. 160 (S.D. Ohio 2014) .................................................................................... 23

*Thacker v. Chesapeake Appalachia, L.L.C.*,
  695 F. Supp. 2d 521 (E.D. Ky. 2010) ................................................................. 11

*UAW v. General Motors Corp.*,
  497 F.3d 615 (6th Cir. 2007) ............................................................. 11, 16, 24

*Veridian Credit Union v. Eddie Bauer LLC,*
  No. 2:17-cv-00356-JLR (W.D. Wash. Oct. 25, 2019) ......................................19

*Williams v. Vukovich*,
  720 F.2d 909 (6th Cir. 1983) ............................................................................ 20

**Statutes**

Okla. Stat. § 23-15(A) ...................................................................................... 17

**Rules**

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 4

Fed. R. Civ. P. 23 ........................................................................................ 24, 25

Fed. R. Civ. P. 23(c)(2) ..................................................................................... 24

Fed. R. Civ. P. 23(e) ..................................................................................... 3, 10

Fed. R. Civ. P. 23(f) ........................................................................................... 5

## INTRODUCTION

This Settlement concludes hard-fought litigation between Plaintiffs American Airlines Federal Credit Union, Arkansas Federal Credit Union, Redstone Federal Credit Union ("Class Representatives" or "Plaintiffs"), and a certified Class of financial institutions against Sonic[1] for its data breach involving millions of credit and debit cards ("Data Breach").  Plaintiffs brought this action seeking recovery for damages incurred in responding to card brand alerts that listed Plaintiffs' cards as having been potentially compromised in the Data Breach.  Those damages included, among other things, costs for reissuing alerted cards and reimbursing fraud incurred on alerted accounts.

As Class Representatives detailed in their Memorandum in Support of Class Representatives' Motion for Preliminary Approval of the Settlement (ECF No. 514), the Settlement provides significant benefits to the Class.  Sonic has agreed to pay up to $3 million to fund Class members' claims for payment cards that Class Members reissued ("Reissuance Payment") or experienced fraud ("Fraud Payment") within four weeks of a card brand alert.  Class members did not need to prove that their damages were caused by the Sonic Data Breach—a contentious issue the parties disputed throughout this action.  Rather, Class members needed only to submit a claim form, under penalty of perjury, identifying the impacted cards and the timing of their alerts and subsequent reissuance or fraud.

In addition to the up to $3 million Sonic would pay to fund Class members' claims, Sonic also agreed to pay up to: (1) $500,000 for settlement administration costs; (2) $10,000 in service awards for each of the Class Representatives; and (3) $2.2 million in attorneys' fees and expenses,

---

[1] "Sonic" or "Defendants" refers to Defendants Sonic Corp. (n/k/a Sonic LLC); Sonic Franchising LLC; Sonic Industries LLC; Sonic Industries Services Inc.' Sonic Restaurants, Inc; and Sonic Capital.

paid separately from the amount used to pay Class member claims.  In all, Sonic agreed to pay up to $5.73 million in exchange for a release of Plaintiffs' and the Class's claims at issue in this action. On May 10, 2022, the Court preliminarily approved the Settlement and directed the Settlement Administrator to issue notice of it to the Class.

After notice and the opportunity to submit a claim, opt out, or object to the Settlement, the Class's response to the Settlement has been positive.  Through the Court-approved notice plan, the Settlement Administrator sent direct, mailed notice to financial institutions who received a card brand alert related to the Sonic Data Breach.  The notice provided information about the action, detailed the Settlement and its benefits, and informed Class members of their rights to opt out of the Settlement, object to the Settlement, or to submit a claim for a Reissuance Payment or a Fraud Payment.  Because the certified Class included all financial institutions who both received an alert related to the Data Breach and took action to reissue or reimburse fraud on an alerted-on card, notice, although overbroad, is expected to have reached fundamentally all possible Class members.

Notably, no Class members filed an objection to the Settlement and only two Class members opted out.  The lack of objections and extremely low opt-out rate shows the Class's support for the Settlement.  Additionally, 360 Class members timely submitted either a Reissuance Claim or a Fraud Claim, creating a claims rate of at least 7%.  This rate, however, is likely higher because, while the claims rate calculation assumes all financial institutions who were sent notice (i.e., all institutions who received a card brand alert) are Class members, only a portion of the notice recipients are actually in the Class—defined to include only those financial institutions that both received an alert *and* took steps to reissue cards or reissue fraud on alerted cards.  This claims rate is consistent with other settlements and, like the opt out and objection rates, illustrates the Class's positive reception of the Settlement.

The Settlement is fair, adequate, and reasonable as required under Fed. R. Civ. P. 23(e), and, accordingly, the Class Representatives now move for final approval.  As detailed further below, the Settlement satisfies each of the factors the Sixth Circuit considers when evaluating whether to grant final approval.  The Class Representatives respectfully request the Court grant final approval of the Settlement and bring to a close three years of hard-fought litigation which, despite proceeding through virtually every phase of litigation, still posed substantial risk with several critical and impactful motions remaining and trial impending.

## BACKGROUND

I.    **Summary of the Extensive and Lengthy Litigation History**

The Parties have litigated this case over three years through nearly every phase of litigation, including a motion to dismiss and subsequent motions for reconsideration, factual, expert, and third-party discovery, class certification, summary judgment, and some pre-trial motion practice. These efforts have informed the parties of the complexity of the action and the risks should litigation go forward and have aided the parties in valuing the settlement against those risks.  The full litigation history is set forth in Class Representatives' Memorandum in Support of Preliminary Approval (ECF No. 514-1).  Class Representatives briefly summarize that history here.

This is a multi-district litigation consolidated before this Court by the Judicial Panel on Multi-District Litigation.  Transfer Order, ECF No. 155.  After consolidation and transfer of the related actions, Plaintiffs American Airlines Federal Credit Union, Redstone Federal Credit Union, and Arkansas Federal Credit Union filed an amended class action complaint ("ACAC") (ECF No. 197) against Sonic.  Plaintiffs alleged Sonic had negligently maintained the data security at certain franchisee restaurant locations, resulting in deficiencies exploited during a cybersecurity attack,

which caused injuries to certain card issuing financial institutions whose payment cards were exposed during the attack.  *See, e.g.*, *id.* at ¶¶ 53–80.

On October 28, 2019, Sonic moved to dismiss the ACAC pursuant to Fed. R. Civ. P. 12(b)(6), principally alleging it owed no duty to Plaintiffs under Oklahoma law or Section 5 of the Federal Trade Commission ("FTC") Act to implement reasonable data security measures.  *See* Defs.' Mem. in Supp. of Mot. to Dismiss, ECF No. 199-1, at 7–15.  Plaintiffs opposed Sonic's motion to dismiss.  Pls.' Opp. to Defs.' Mot. to Dismiss, ECF No. 211.  On July 1, 2020, the Court denied in part and granted in part Sonic's motion, holding that Plaintiffs' negligence claim should survive but dismissing Plaintiffs' negligence *per se* and declaratory relief claims.  Mot. to Dismiss Order, ECF No. 304.  The Court also later denied Sonic's motion and renewed motion for reconsideration of the Court's motion to dismiss order or, alternatively, to certify certain questions to the Oklahoma Supreme Court.  Order Denying Mot. for Recons., ECF No. 357.

After briefing the motion to dismiss and extensive discovery, Plaintiffs moved to certify a Class of financial institutions who received card brand alerts related to the Data Breach.  Pls. Mem. in Supp. of Mot. for Class Certification, ECF No. 240-1.  Plaintiffs argued certification was appropriate because common questions of Sonic's liability predominated, particularly since only a single state's law, Oklahoma's, applied to Plaintiffs' and the Class's claims.  *Id.* at 13–18.  Sonic opposed Plaintiffs' motion.  Defs.' Opp. to Pls.' Mot. for Class Certification, ECF No. 266.  The Court granted Plaintiffs' motion for class certification but modified the Class definition to:

> All banks, credit unions, and financial institutions in the United States that received notice and took action to reissue credit cards or debit cards or reimbursed a compromised account from any card brand involved with the Sonic Data Breach.

Class Certification Order, ECF No. 348, at 1.

After the Class certification Order, Sonic petitioned the Sixth Circuit pursuant to Fed. R. Civ. P. 23(f) for permission to appeal the order.  Defs.' Rule 23(f) Pet., ECF No. 352-1.  Plaintiffs opposed Sonic's petition, and, on Aug. 26, 2021, the Sixth Circuit denied Sonic's request for permission to appeal.  Order Denying Defs.' Rule 23(f) Pet., ECF No. 447.

On July 15, 2020, after extensive fact, expert, and third-party discovery, Sonic moved for summary judgment on Plaintiffs' negligence claim.  Defs.' Mot for Summ. J., ECF No. 310.  Sonic claimed summary judgment was appropriate because it did not take any affirmative acts that created the risk of the Data Breach, and therefore, had no duty under Oklahoma law.  Mem. in Supp. of Defs.' Mot. for Summ. J., ECF No. 311.  Plaintiffs opposed Sonic's summary judgment motion.  Pls.' Opp. to Defs.' Mot. for Summ. J., ECF No. 327.

Subsequently, after the Court granted Plaintiff's motion for Class certification and before the Court had ruled on Sonic's initial summary judgment motion, Sonic requested an opportunity to submit supplemental summary judgment arguments.  In its supplemental briefing, Sonic argued summary judgment was also appropriate because: (1) the conduct of the criminal hackers and card brands who issued the alerts constituted intervening acts that absolved Sonic of liability; and (2) Plaintiffs supposedly had no evidence linking their damages to Sonic's Data Breach.  Defs.' Suppl. Br. on Summ. J., ECF No. 432.  Plaintiffs opposed Sonic's supplemental arguments, asserting that issues of causation should be reserved for the factfinder.  Pls.' Suppl. Br. on Summ. J., ECF No. 438.  On July 28, 2021, the parties argued the summary judgment motion before the Court.  On September 7, 2021, the Court denied Sonic's summary judgment motion in its entirety.  Order Denying Defs.' Mot. for Summ. J., ECF No. 453.

After the Court's order denying summary judgment, the parties briefed a series of critical motions, some of which remain pending.  Those motions included: (1) Sonic's motion to exclude

Plaintiffs' expert, Ian Ratner (ECF No. 475); (2) Sonic's motion to exclude Plaintiffs' expert, Neil Librock (ECF No. 476); (3) Sonic's motion to decertify the Class (ECF No. 477); (4) Sonic's motion for remand of the MDL actions to their original jurisdictions (ECF No. 481); and (5) Plaintiffs' renewed motion to bifurcate trial (ECF No. 503).

The Court granted in part and denied in part Sonic's motions to exclude Plaintiffs' experts, excluding Mr. Ratner and narrowing, but not excluding, Mr. Librock's testimony.  Order Granting in Part Defs.' Mot. to Exclude Pls.' Experts, ECF No. 498.   Sonic's motion to decertify the Class and motion to remand the case were fully briefed but have not been argued or ruled upon.  Plaintiffs filed their renewed motion to bifurcate the trial shortly before the parties' final settlement negotiations and it has not been fully briefed.  Renewed Mot. to Bifurcate, ECF No. 503.

At the time of the Settlement, the parties were preparing this case for trial.

## II.    The Parties' Class Action Settlement Agreement and Preliminary Approval

The proposed Settlement is the product of arduous negotiations that culminated in a marathon, three-full-day mediation session before United States Magistrate Judge Jonathan D. Greenberg.  In November 2021, the parties renewed settlement negotiations, both on their own and with the assistance of Judge Greenberg.  The discussions advanced and the parties agreed to a mediation before Judge Greenberg on January 31, 2022.  After an all-day negotiation, the parties did not come to an agreement.  However, after two more days of all-day, extensive negotiations, the parties reached a tentative settlement on February 2, 2022.  The parties continued to negotiation the details of the Settlement up to April 26, 2022, the date on which Plaintiffs moved for preliminary approval.  Pls.' Mot. for Preliminary Approval of the Settlement, ECF No. 514.

Under the Settlement Agreement, Sonic has agreed to pay up to $5.73 million to resolve Plaintiffs' and the Class's claims.  Settlement Agreement and Release ("SAR"), ECF No. 514-3.

Specifically, Sonic has agreed to pay: (1) up to $3,000,000 to fund Class members' claims for a flat payment of $1.00 per card for cards reissued and $1.50 per card experiencing fraud within four weeks following receipt of a card brand alert of the cards in the Data Breach; (2) up to $500,000 for Settlement administration; (2) up to $30,000 for Class Representative Service Awards; and (4) up to $2,200,000 to pay attorneys' fees and expenses.

Any Class member who reissued an alerted-on card or experienced fraud on an alerted-on card within four weeks of the time the card was first alerted-on as potentially compromised in the Data Breach was eligible to submit one of two types of claims: a Reissuance Payment or a Fraud Payment.  The Reissuance Payment would allow Class members to receive $1.00 for each eligible payment card it reissued.  The Fraud Payment would allow Class members to receive $1.50 for each eligible payment card that experienced fraud.  Payment cards were eligible for a Reissuance Payment or Fraud Payment if the card was: (1) issued by the Class member; (2) included on a Sonic-related card brand alert; and (3) experienced fraud or was reissued by the Class member within four weeks of when the card first appeared on the Sonic-related alert.

To receive a claim payment, Class members were only required to complete a Claim Form and either provide basic data regarding the timing of its reissued and fraud cards, or the total amount of reissued and fraud cards along with an explanation of how they calculated the numbers. If the total value of all Class members' claims exceeds $3,000,000, then the Reissuance Payment and Fraud Payment would be decreased by a pro-rata basis such that the full $3,000,000 would be disputed to those Class members who submitted timely and valid claims.[2]

---

[2] Under the Settlement Agreement, Sonic has the option to audit up to 10% of the claims that provided data on the timing of the card reissuance and fraud reimbursement and, for those that did not but provided only an explanation of their calculation methods, any claim that appears erroneous on its face given the card brand data in hand, and for the latter group Sonic may audit any of the

On May 10, 2022, the Court preliminarily approved the Settlement Agreement and directed the Settlement Administrator to issue notice to the Class.  Preliminary Approval Order, ECF No. 518, at 6–7.

## III.    KCC Properly Administered the Settlement Agreement

### A.    Notice Issued Pursuant to the Settlement Agreement

KCC Class Action Services, LLC ("KCC") implemented the notice plan contemplated by the Settlement and approved by the Court.  Decl. of Gio Santiago ("Santiago Decl."), at ¶ 2–5 (submitted concurrently with this motion).  First, KCC obtained from Plaintiffs' counsel the list of financial institutions to whom Court-approved notice was previously sent in this action when the Court certified the Class.  *Id.* at ¶ 2.  KCC updated the previous Class list as necessary to: (1) de-duplicate the records; (2) check postal addresses against the National Change of Address database; (3) certify the addresses via the Coding Accuracy Support System; and (4) verify the addresses and identities of the financial institutions through Delivery Point Validation.  *Id.*  KCC then sent the Long Form Notice and Claim Form to the 5,085 institutions on the Class list.  *Id.* at ¶ 3.  KCC attempted to resend any undeliverable notices using an available postal service forwarding address or an address obtained through KCC's own investigation.  *Id.* at ¶ 5.  KCC was unable to find an alternative address for 307 of the listed institutions.  *Id.*

### B.    The Class's Reception of the Settlement Agreement—Claims, Opt Outs, and Objections

Class members positively received the Settlement and its benefits.  In all, 360 Class members of the 5,085 who received notice submitted a claim for reimbursement of card reissuance

---

claims.  Sonic has not yet exercised its audit rights but may choose to do so and has requested some additional information from the Administrator.

costs or fraud reimbursement. *Id.* at ¶ 9. No Class member objected to the Settlement and only two Class members requested to be excluded from the Settlement. *Id.* at ¶ 10–11.

### C.    The Administrator Carried Out Its Duties Under the Settlement

Apart from issuing notice according to the Court's order, KCC also complied with its other obligations under the Settlement. Specifically, KCC timely created a Settlement Website, toll-free telephone number and Settlement P.O. Box. *Id.* at ¶ 6–8. The Settlement Website provided copies of the Settlement Agreement, Preliminary Approval Order, Settlement Frequently Asked Questions, Long-Form Notice, and Claim Form, Motion for Attorneys' Fees and Expenses, and other important documents and deadlines. *See id.* Additionally, the Administrator made claim forms available to be submitted by mail or through the Settlement Website.

In administering the Settlement, KCC also assisted certain Class members who experienced difficulties submitting their claims, and successfully resolved those issues. *Id.* at ¶ 8. KCC and Class Counsel took the resolution of any claim submission issues seriously and communicated frequently to ensure any such issues were fully resolved and investigated. *Id.* Due to KCC's investigations, communication with Class members, and discussions with Class Counsel and counsel for Sonic, Class Counsel believe any issues experienced by Class members attempting to submit a claim were resolved.

### D.    Plaintiffs' Motion for Attorneys' Fees and Expenses and Class Representative Service Awards

On August 8, 2022, Class Representatives moved the Court for an award of attorneys' fees and expenses and of payment of Class Representative service awards. ECF No. 522-1. Specifically, Class Counsel sought Class Representative Service Awards totaling $30,000 ($10,000 per Class Representative) and attorneys' fees and expenses of $2,200,000. *Id.* at 2. If

granted, Sonic will pay any amount awarded for service awards and attorneys' fees and expenses separately from the amount used to pay Class member claims and Settlement administration costs.

## ARGUMENT

### I.     The Court Should Grant Final Approval of the Settlement

Parties seeking to settle a class action must first seek approval from the Court.  Fed. R. Civ. P. 23(e).  "Whether a class action settlement satisfies Rule 23(e) is committed to the sound discretion of the district court."  *In re Whirlpool Corp. Front-loading Washer Prods. Liab. Litig.*, 1:08-WP-65000, 2016 WL 5338012, at *6 (N.D. Ohio Sept. 23, 2016); *see also Doe v. Ohio*, No. 2:91-cv-0464, 2020 WL 728276, at *3 (S.D. Ohio Feb. 12, 2020) ("The Court 'enjoys wide discretion in assessing the weight and applicability of [the settlement approval] factors.'" (quoting *Granada Investments, Inc. v. DWG Corp.*, 962 F.2d 1203, 1205–06 (6th Cir. 1992)).

In the Sixth Circuit, district courts follow a three-step process to determine whether to approve a class action settlement: (1) "the court must preliminarily approve the proposed settlement;" (2) "members of the class must be given notice of the proposed settlement;" and (3) "a hearing must be held to determine whether the decree is fair to those affected, [and is] adequate and reasonable."  *In re Polyurethane Foam Antitrust Litig.*, No. 10-md-2196, 2012 WL 12868246, at *4 (N.D. Ohio Jan. 23, 2012).  Here, the first two steps are completed.  On May 10, 2022, the Court preliminarily approved the Settlement Agreement, performing an initial determination that the settlement appeared to be fair, adequate, and reasonable.  Preliminary Approval Order, ECF No. 518.  In the Preliminary Approval Order, the Court directed the Settlement Administrator to issue notice to the potential Class members according to a Notice Plan that provided direct notice to all financial institutions that received an alert from any card brand identifying payment cards impacted by Sonic's Data Breach.  *Id.* at 6–7.  As discussed further in Section II herein, KCC

successfully implemented the notice plan, directly notifying potential Class members of the Settlement.  Santiago Decl., at ¶¶ 2–5.

Having completed preliminary approval and notice to the Class, the last step is for the Court to consider whether to grant final approval of the Settlement.  *Polyurethane*, 2012 WL 1286246, at *4.  Courts in the Sixth Circuit consider seven factors when deciding whether to grant final approval: (1) the risk of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the amount of discovery conducted by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of the class members; and (7) the public interest.  *Whirlpool Corp.*, 2016 WL 5338012, at *6 (citing  *Int'l United Auto., Aerospace, and Agric, Implement Workers of Am. v. Gen. Motors Corp. ("UAW")*, 497 F.3d 615, 631 (6th Cir. 2007); *see also In re Packaged Ice Antitrust Litig.*, No. 17-md-2137, 2018 WL 4520931, at *6 (6th Cir. 2018).  Here, each of these factors fully supports final approval of the Settlement.

### A.      The Settlement Is Free from Fraud and Collusion

"Courts presume the absence of fraud or collusion in class action settlements unless there is evidence to the contrary."  *Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521, 531 (E.D. Ky. 2010) (internal quotations omitted); *see also UAW*, 497 F.3d at 628 (noting that courts "presum[e] that the class representatives and counsel handled their responsibilities with the independent vigor that the adversarial process demands.").

Here, the adversarial litigation and substantive settlement negotiations before Judge Greenberg provide evidence that this Settlement is free from fraud and collusion.  *See Ball v. Kasich*, No. 2:16-cv-0282, 2020 WL 1969289, at *6 (S.D. Ohio, Apr. 24, 2020) ("Some indicia of the parties' good faith include: that [settlement] negotiations occurred after the case was well

advanced, that negotiations were not rushed once they started, [and] that the parties' negotiated at arms-length." (internal citations omitted)).  Indeed, this action has been heavily litigated through nearly every phase of litigation, and, at the time of the Settlement, was poised to proceed to trial. *See Moulton v. United States Steel Corp.*, 581 F.3d 344, 351 (6th Cir. 2009) ("It is difficult to maintain that Class Counsel" vigorously litigated a case for years "merely to mask its collusion with [the defendant], and that the one entity with a bird's eye view of the proceeding—the district court judge—somehow missed the signs that the parties were merely engaged in pretense and posturing."); *Priddy v. Edelman*, 883 F.2d 438, 447 (6th Cir. 1989) ("Where the proposed settlement was preceded by a lengthy period of adversarial litigation involving substantial discovery, a court is likely to conclude that the settlement negotiations occurred at arm's length.").

Additionally, the parties agreed upon the Settlement only after significant arm's length settlement negotiations before an experienced mediator, Magistrate Judge Greenberg.  *See, e.g.*, *Doe*, 2020 WL 728276, at *4 (finding no risk of fraud or collusion where "[t]he Parties participated in multiple mediation sessions before reaching the Settlement Agreement" and "with the assistance of a capable and experienced mediator[.]").  Even before formally mediating before Judge Greenberg, the parties spent significant time and effort negotiating over the course of several months.  Then, continuing over three full days, the parties participated in lengthy settlement discussions with the assistance of Judge Greenberg before reaching an agreement in principle.

The lengthy, adversarial litigation history, extensive discovery, and the negotiations before Judge Greenberg collectively illustrate that this Settlement is the product of good-faith and arms' length negotiations.  There is no evidence or allegation by any Class member, or anyone else, that the Settlement is the product of fraud or collusion.  As such, this factor supports final approval.

### B.    The Complexity, Expense, and Duration of the Litigation Support Final Approval

The complexity, expense, and duration of this litigation also favors final approval of the Settlement.  Under this factor, a "[s]ettlement is more likely to be approved if the case has a long history, if the issues involved would require significant trial time to resolve, [and] if appeals are likely to further delay ultimate resolution[.]" *Doe*, 2020 WL 728276, at *4 (internal citations removed).  Here, this case has a long history, and while the case is near to trial, several likely highly contested issues remain.  For example, Sonic has moved to decertify the Class, a highly disputed motion that, regardless of how the Court rules, would likely be subject to appeal.  Defs.' Mot. to Decertify the Class, ECF No. 477.  Additionally, Sonic has also moved to dissolve the MDL and remand the case to the Western District of Oklahoma—where one of the Plaintiffs filed its initial action.  Defs.' Mot. to Remand, ECF No. 481.  Should Sonic prevail, the parties would be required to expend significant time and effort preparing for trial before a judge entirely unfamiliar with the proceedings.

Additionally, trial of this complex, Class action case would likely be lengthy and highly burdensome.  Plaintiffs, for instance, have proposed that trial be divided into three parts: (1) a trial on Classwide liability; (2) a trial on Classwide damages issues; and (3) individual proceedings before a Special Master to resolve certain individual damages issues.  Pls.' Renewed Mot. to Bifurcate, ECF No. 498.  This significant effort would potentially include individual damages proceedings of upwards of thousands of Class member institutions, resulting in significant expense for both parties.   Settling now, however, avoids the costly proceedings remaining in this litigation. *See Whirlpool Corp.*, 2016 WL 5338012, at *10 ("Settlement avoids a huge consumption of resources of the parties and the Court.").  This factor, therefore, supports final approval.

### C.     The Parties Conducted Substantial Discovery throughout the Litigation

The third factor, the amount of discovery conducted by the parties, confirms that Class

Counsel and the Class Representatives "had access to sufficient information to evaluate [their]

case and to assess the adequacy of the proposed Settlement[.]" *Bartell v. LTF Club Operations*

*Co., Inc.*, No. 2:14-cv-0401, 2020 WL 7062834, at *4 (S.D. Ohio Aug. 7. 2020) (citing *In re*

*Broadwing, Inc. ERISA Litig.*, 252 F.R.D. 369, 374 (S.D. Ohio 2006)).  Here, the parties spent

significant time engaging in discovery over the course of the litigation, which has put them in a

sufficient position to evaluate the fairness of the Settlement.  *See Satterly v. Airstream Inc.*, No

3:19-cv-0032, 2020 WL 6536342, at *5 (S.D. Ohio Sept. 25, 2020) (approving a class action

settlement where "the parties reached a settlement after an extensive review and computation of

damages" and "substantial discovery exchanged between the parties" and because the litigation

was "hotly contested in all respects[.]"); *Whirlpool Corp.*, 2016 WL 5338012, at *10 ("This

extensive discovery . . . gave the parties a clear understanding of the strengths and weaknesses of

their claims and defenses in this case.").

Both parties served and responded to multiple sets of document requests, interrogatories,

and requests for admission, exchanging and reviewing hundreds of thousands of documents.  Class

Representatives deposed Sonic's corporate representatives, Mark Davis, Corey Horsch, Jared

Simon, Yvonne Nottnagel, Andrew Hall, and Chase Beckham, including efforts to authenticate

hundreds of documents for trial.  Sonic deposed corporate representatives from each of the Class

Representatives institutions.

Class Representatives and Sonic each also served document requests on relevant third

parties, including Visa, Mastercard, Cylance, Trustwave, SD Missouri, SecureWorks, and Ernst &

Young, and jointly deposed representatives of some of these third parties.  Sonic served discovery

on five absent Class members, most whom it also deposed: Alcoa Federal Credit Union, Logix Federal Credit Union, Ascend Federal Credit Union, Georgia's Own Credit Union, and Pentagon Federal Credit Union.

This case also involved extensive expert and technical analysis and testimony, including on both liability and damages issues.  Class Representatives retained three experts to support their claims: (1) Matthew Strebe, a technical expert who provided testimony on Sonic's data security and its relationship to the Data Breach; (2) Ian Ratner, Plaintiffs' Classwide damages expert, who proposed a model to measure aggregate Class damages; and (3) Neil Librock, an expert on financial institutions' risk analysis and response who offered opinion regarding classwide injury. Sonic also retained three experts: (1) Lorin Hitt and Andrew Richmond, both of whom responded to Class Representatives' Classwide damages model; and (2) Bruce Hartley, Sonic's liability and technical expert.  Sonic twice deposed each of Class Representatives' experts and Class Representatives deposed Mr. Hitt.

The advanced stage of the case and substantial discovery efforts completed by both parties supports final approval of the Settlement.

> ### D.  The Settlement's Benefits are Fair, Adequate, and Reasonable Given the Significant Risk of Continued Litigation

"'The most important factor to be considered in reviewing a settlement is the probability of success on the merits'" because the "'likelihood of success . . . provides a gauge from which the benefits of the settlement must be measured.'"  *Whirlpool Corp.*, 2016 WL 5338012, at *11 (quoting *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 2016)).  This factor is intended to "weigh the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement" and to ensure "the parties are using the settlement to resolve legitimate legal and factual disagreements."  *Ball*, 2020 WL 1969289, at *6 (internal

quotations omitted).  The purpose of this inquiry is "not to 'decide whether one side is right or even whether one side has the better of these arguments'" but rather to establish that "the parties are locked in a real dispute" and that "the merits of the Class's case are not so overwhelming that continued litigation is a vastly better option than settlement."  *Id.* (quoting *UAW*, 497 F.3d at 632).  Here, both parties face significant risk should litigation continue, and the Settlement resolves that risk while providing the Class with significant benefits.

### i.     Plaintiffs Face Significant Risk Should Litigation Continue

This complex case has been heavily litigated for three years and, at the time of Settlement, significant motions were pending that may have significantly impacted the issues and extent of damages in this case.  Throughout the litigation, Plaintiffs obtained numerous successes and contend they maintain a high chance of success at trial, especially as to Sonic's liability for the Data Breach and resulting harm.  However, Sonic's challenges to damages and liability threaten to undermine Plaintiffs' claims entirely or reduce the amount of damages.

Sonic has maintained that Plaintiffs cannot prove their damages due to other potential causation, including the frequency of other data breaches.  That argument, in part, resulted in the exclusion of Plaintiffs' damages expert and prompted Sonic's motion to decertify the Class—a motion which is still pending.  The decertification motion threatens to significantly undermine, if not entirely prevent, Plaintiffs' ability to obtain any relief for the Class.  *See Bartell*, 2020 WL 7062834, at *4 (noting that a potentially "adverse ruling on [a pending motion] would severely damage the Class" meaning "the likelihood of success is highly uncertain" and creating "substantial risk to the Class.").

If the Class was not decertified, Plaintiffs would have to contend with Sonic's causation and damages arguments to trial, without their excluded damages expert.  To prove their damages,

Plaintiffs proposed, in part, to use individual Class member proceedings to measure individual damages.  Pls.' Renewed Mot. to Bifurcate, ECF No. 498.  Those proceedings would require Class members to present documented evidence of damages to a Special Master, subject to Sonic's individual causation defenses.  The process of presenting individual damages evidence poses additional risk, specifically, that if Plaintiffs succeeded on liability, Class members still may not desire to participate in individual proceedings or may not have sufficient documentation to demonstrate the amount of their damages.

Finally, Plaintiffs also face the challenge of proving Sonic's liability.  Plaintiffs successfully defeated Sonic's motions to dismiss and for summary judgment, which sought to deflect blame for the breach onto its vendors and franchisees.  At trial, Plaintiffs would need to convince a jury of Sonic's fault and overcome Sonic's defenses and expert testimony.  If the jury found Sonic only partially responsible, there is a risk under Oklahoma law that the recoverable damages would be diminished or nullified.  *See Loos v. Saint-Gobain Abrasives, Inc*., No. 15-cv-0411, 2016 WL 5017335, at *6 (W.D. Okla. Sept. 19, 2016) (holding defendants could not "be forced to pay for more than its proportionate share of liability if it [was] found negligent" because Oklahoma applies pure several liability under Okla. Stat. § 23-15(A)).  The cost of proving Sonic's liability would be significant, as liability issues require substantial fact and expert testimony.

Given these risks, Plaintiffs face the possibility that continued litigation would substantially reduce, or preclude, any recovery.

### ii.     The Settlement's Benefits Compare Favorably to the Risks of Continued Litigation

Compared to the risks of continued litigation where Class members may receive nothing, the Settlement provided all Class members with an opportunity to submit a Claim for recovery of certain losses most likely to have been attributable to the Data Breach.  Under the Settlement, any

Class member who reissued an alerted-on card or reimbursed fraud on an alerted-on account within four weeks of the card brand alert could submit a claim for a Reissuance Card Payment or a Fraud Card Payment.  The Settlement, thus, provides recovery in a similar manner as Plaintiffs' damages' theory—that fraud or card reissuance costs occurring closer in time to the Data Breach were more likely to be caused by it.  *See* Pls.' Opp. to Defs.' Mot. to Decertify, ECF No. 486, at 9 (asserting that the "proximity of Plaintiffs' and the Class's actions to the Data Breach" are what make it "more likely that not [that those actions were] caused by the Sonic Data Breach.").

Moreover, the Settlement obviated the need for Class members to evidence their damages, as they would likely have had to do at trial.  *See* Pls.' Renewed Mot. for Bifurcation, ECF No. 503-1, at 11–12 (proposing Class members provide certain evidence of individual damages using a formulaic process before a Special Master).  Regardless of whether Plaintiffs' damages model survived, Class members would have had to come forward with evidence that: (1) they were members of the Class; and (2) information causally relating the alerted-on payment cards with fraud and card reissuance costs, and factually quantifying those losses.  *See* Pls.' Mot. to Issue Class Notice, ECF No. 402, at 2 (notifying the Class that they "may have to take additional steps to get a share [of any damages award], such as submitting a claim form and submitting evidence showing that Sonic's acts caused any fraud reimbursed or card replacement.").  The Settlement, however, removed that potentially lengthy and burdensome process, allowing Class members to secure claim payments by submitting a claim form with basic data under penalty of perjury.  Here, as described further below, the Class reacted favorably to the Settlement, with no Class members objecting, only two Class members opting out, and 360 claimants submitting timely claims. Santiago Decl. at ¶¶ 9–11.

Apart from the claim benefits, the Settlement also resolved Plaintiffs' and the Class's claims now, providing immediate relief against the uncertainty of continued litigation.  *See Bartell*, 2020 WL 7062834, at *5 ("Settlement confers immediate benefits on the Class Members, avoids the risks and expense of further litigation, and conserves judicial resources.").   Given the contentious and heavily litigated history of this action, further litigation is likely to continue to be contentious and lengthy, with the possibility of protracted litigation on appeal.  The Settlement avoids those additional burdens and costs and guarantees some relief for the Class now.

For those reasons, courts have frequently approved similar data breach settlements.  *See, e.g.,* Order Granting Final Approval, *In re Arby's Rest. Grp., Inc. Data Sec. Litig.*, No. 1:17-cv-0514 (N.D. Ga. Nov. 20, 2020) (approving claims-made settlement); Order Granting Final Approval, *Veridian Credit Union v. Eddie Bauer LLC,* No. 2:17-cv-00356-JLR (W.D. Wash. Oct. 25, 2019) (same); Order Granting Final Approval, *In re Arby's Rest. Grp., Inc. Data Sec. Litig*., No. 1:17-cv-1035-WMR (N.D. Ga. June 6, 2019) (granting final approval of consumer claims-made settlement with identify theft protection services); Order Granting Preliminary Approval, *In re Community Health Sys*., No.: 15-CV-222-KOB (N.D. Ala. Aug. 22, 2019) (granting preliminary approval for claims-made settlement); *In re Anthem, Inc. Data Breach Litig*., 327 F.R.D. 299, 332 (N.D. Cal. Aug. 15, 2018) (granting motion for final approval with a claims-made settlement and fraud-monitoring services for the entire class).[3]

### E.   Class Counsel and the Class Representatives Support the Settlement

In this Circuit, courts generally "defer to the judgment of experienced counsel who [have] competently evaluated the strength of [their] proofs."   *Doe*, 2020 WL 728276, at *6 (citing

---

[3] These orders were submitted as exhibits to Plaintiffs' Mem. in Supp. of Mot. for Prelim. Approval.  *See* ECF Nos. 514-4–8.

*Williams v. Vukovich*, 720 F.2d 909, 922–23 (6th Cir. 1983)); *see Kritzer v. Safelite Solutions, LLC*, No. 2:20-cv-0729, 2012 WL 1945144, at *7 *S.D. Ohio May 30, 2012) ("The Court gives weight to the belief of experienced counsel that a settlement is in the best interests of the class." (internal citation omitted)).  Here, Class Counsel and Class Representatives support the Settlement.

Class Counsel are deeply experienced in complex class actions and data breach litigation. Prior to this case, Class Counsel were involved in litigating, and satisfactorily resolving, the Target, Home Depot, Wendy's, and Arby's data breach cases, among several others, on behalf of financial institutions.  ECF No. 173.  Co-lead counsel Brian Gudmundson has practiced law for eighteen years throughout the United States, including as class counsel or as a part of the steering committee in numerous data breach actions on behalf of financial institutions (e.g., Arby's, Equifax, Target, Marriott, Wendy's, and Home Depot) and several other similarly large and complex class actions.  *Id.* at 6–8.  Co-lead counsel Charles Van Horn has extensive experience litigating on behalf of financial institutions in data breach and cyber-related issues, including as part of the steering committee in several data breach cases (Arby's, Equifax, Marriott, and others). *Id.* at 8–9.  The executive committee also has decades of combined experience working as co-counsel in class actions, multi-district litigation, and other complex litigation relating to data security.  *Id.* at 9–12.

Given their experience in complex litigation generally, and their knowledge of the risks of continued litigation and the likelihood of success on the merits, Class Counsel's approval of the Settlement weighs in favor of final approval.

As with Class Counsel, the Class Representatives support the Settlement, and each has timely filed a Claim.  Class Representatives, like Class Counsel, are informed of the risks of continued litigation, have vigorously pursued this case on behalf of the Class, participated in

discovery and provided assistance to Plaintiffs' damages experts, and were kept informed and provided input during settlement negotiations.  *See Doe*, 2020 WL 728276, at *6 (finally approving a class action settlement where the "class representatives vigorously prosecuted the interests of the class throughout the litigation and settlement negotiations" including by "responding to written discovery requests, providing copious records, and attending depositions").

This factor, therefore, also supports final approval of the Settlement.

### F.    The Class Reacted Positively to the Settlement Agreement

The reaction of the Class to the Settlement also supports final approval.  This factor considers the response of the Class to the Settlement, including the number of Class members who opted out of the Settlement or objected to the Settlement.  *See, e.g.*, *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 527 (E.D. Mich. 2003) ("That the overwhelming majority of class members elected to remain in the Settlement Class, without objection, constitutes the 'reaction of the class,' as a whole, and demonstrates that the settlements are 'fair, reasonable, and adequate.'"); *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 175 (S.D.N.Y. 2000) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." (citations omitted)).

Here, nearly the entire Class chose to remain in the Settlement.  Santiago Decl., at ¶ 10. Pursuant to the Settlement's notice plan, KCC issued direct notice to every recipient of a card brand alert issued due to the Data Breach.  *Id.* at ¶¶ 2–5.  Because a financial institution could only be included in the Class if they received such an alert, every possible Class member should have received notice of the Settlement with information on the Class members' rights under the Settlement.

Despite receiving notice of the Settlement, only two Class members (out of 5,085 financial institutions who were sent notice) opted out and none objected to it.  *Id.* at ¶ 10–11. This data strongly suggests the Class positively received the Settlement.  *See Borders v. Alternative Solution Health Network, LLC*, No. 2:20-v-1273, 2021 WL 4868512, at *4 (S.D. Ohio May 17, 2021) (holding that the "reaction of absent class members favors approval" where "only two class members [of 415] opted out and none objected to the Settlement, resulting in an inclusion rate of approximately 99.5%[.]"); *Rotondo v. JPMorgan Chase Bank, N.A.*, No. 2:19-cv-2328, 2019 WL 6167086, at *6 (S.D. Ohio Nov. 20, 2019) ("[T]here were no objections and only three requests for exclusion" and "[t]his positive response from the Settlement Class weighs in favor of approving the settlement.").  The lack of objections and few opt outs supports the Settlement's fairness.  *See Shames v. Hertz Corp.*, 07-cv-2174, 2012 WL 5392159, at *8 (S.D. Cal. Nov. 5, 2012) ("The absence of a large number of objectors supports the fairness, reasonableness, and adequacy of the settlement.").

Additionally, the Settlement claims rate, which reflects the percentage of claimants who timely submitted claims, also demonstrates the Class's positive reaction to the Settlement.  Here, subject to the Administrator's review of the claim validity, 360 of the 5,085 financial institutions who received notice timely filed a claim.  Santiago Decl., at ¶ 9.  This represents a minimum claims rate over 7%.  Such a claims rate has been repeatedly approved in other class action settlements.  *See Whirlpool Corp.*, 2016 WL 5338012, at *12 (finding that "7.3% of class members who received direct notice" filed a claim and holding that "[o]ther courts have characterized response rates much lower than this as a 'favorable class reaction[.]'" (citing *Shames*, 2012 WL 5392159, at *14)); *Shames*, 2012 WL 5392159, at *14 (S.D. Cal. Nov. 5, 2012) (collecting numerous cases where approval was granted when the claims rates varied between 1% to 9%).

Moreover, the Claims rate is likely much higher than 7% because it is calculated based on the universe of notice recipients but not all notice recipients were Class members.  When the Court certified the Class, it narrowed the Class definition to include only financial institutions who: (1) received an alert from a card brand due to the Data Breach; *and* (2) took action to either reissue an alerted-on card or reimburse fraud on an alerted-on account.  Class Certification Order, ECF No. 348, at 1.  While all 5,085 financial institutions who received an alert due to the Data Breach were sent notice of the Settlement, not all notice recipients likely took action to reissue an alerted-on card or reimburse fraud.  Therefore, the Class size is likely smaller than the number of institutions that were sent notice, meaning that the Claims rate is also likely higher.

Here again, the reception of the Class, including the small number of requests for exclusion and the lack of any objection to the Settlement collectively show the Class's positive reaction to the Settlement and support final approval.

### G.     The Settlement Agreement is in the Public Interest

"Public policy generally favors settlement of class action lawsuits" because settlement "provides relief for a substantial number of class members, avoids further litigation, and frees the Court's judicial resources." *Whirlpool Corp.*, 2016 WL 5338012, at *12 (citing *Stinson v. Delta Mgmt. Assocs.*, 302 F.R.D. 160, 165 (S.D. Ohio 2014)); *Doe*, 2020 WL 728276, at *7 ("Public policy generally favors settlement of class action lawsuits.").  "Settlements of complicated cases typically meet this factor because 'there is a strong public interest in encouraging settlement of complex litigation and class action suits because they are notoriously difficult and unpredictable and settlement conserves judicial resources." *Ball*, 2020 WL 1969289, at *8.  Here, the Settlement will end a heavily litigated, complicated Class action involving and providing potential relief for thousands of financial institutions.  Resolving this case now undoubtedly conserves judicial

resources and avoids the substantial burden of continued litigation.  This factor supports final approval of the Settlement.

## II.    Notice to the Class Satisfied Fed. R. Civ. P. 23(e)

Notice of a class action settlement must meet the requirements of Fed. R. Civ. P. 23(c)(2), which requires notice be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *UAW*, 497 F.3d 615, 629–30 (6th Cir. 2007).  Here, notice satisfied due process and Rule 23 because it was issued directly to fundamentally all possible Class members and informed them of the Settlement, their rights to opt out, file a claim, or submit an objection to the Settlement.  Santiago Decl. at ¶¶ 3, Ex. A.

"To compare with the requirements of due process, notice must be 'reasonably calculated to reach interested parties."  *Fidel v. Farley*, 534 F.3d 508, 514 (6th Cir. 2008) (quoting *Karkoukli's Inc. v. Dohany*, 409 F.3d 279, 283 (6th Cir. 2005)).  Where possible, notice should be issued to Class members directly.  *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-cv-1998, 2009 WL 5184352, at *12 (W.D. Ky. Dec. 22, 2009).  The notice plan here included direct notice sent to fundamentally all possible Class members.  Santiago Decl. at ¶¶ 2–4.  Specifically, to be a Class member, a financial institution must have: (1) received an alert from a card brand related to the Sonic Data Breach; and (2) took action to either reissue an alerted-on card or reimburse fraud on an alerted-on account.  Under the notice plan, notice of the Settlement was issued to all financial institutions that received an alert from a card brand related to the Sonic Data Breach, with only 307 notices (about 6% of the Class) being returned as undeliverable and

for whom the administrator could not identify an alternative address.  Santiago Decl. at ¶ 5.  While the notice plan was deliberately overbroad, it also ensured that notice was sent to as many potential Class members as possible.

The notice also provided Class members with information sufficiently describing the Settlement and Class members' rights.  *See Mitcham v. Intrepid U.S.A., Inc.*, No. 3:17-cv-0703, 2019 WL 2269918, at *5 (W.D. Ky. May 28, 2019) ("Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and come forward and be heard." (internal citations removed)); *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975) (finding notice sufficient where it "explained its purpose, discussed the nature of the pending suit and proposed class and accurately summarized the settlement agreement.").  Here, the long form notice directly mailed to potential Class members described the terms of the Settlement, notified Class members of their rights to submit a Claim, opt out of the Settlement, or object to it, and provided Class members with opportunities to obtain more information, including through the Settlement Website or by calling the Settlement's Toll-Free Number.  This information aligns with the information necessary to satisfy the requirements of due process and Rule 23.  *See* Santiago Decl., at ¶ 4.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for final approval of the proposed Settlement.

Respectfully submitted,

Dated: September 22, 2022

*/s/ Brian C. Gudmundson*
Brian C. Gudmundson
Michael J. Laird
**ZIMMERMAN REED LLP**
1100 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
brian.gudmundson@zimmreed.com
michael.laird@zimmreed.com

Charles H. Van Horn
Katherine M. Silverman
**BERMAN FINK VAN HORN P.C.**
3475 Piedmont Road, NE
Suite 1640
Atlanta, GA 30305
Telephone: (404) 261-7711
Facsimile: (404) 233-1943
cvanhorn@bfvlaw.com
ksilverman@bfvlaw.com

*Interim Co-Lead Counsel for Plaintiffs and the Class*

Joseph P. Guglielmo
Erin Green Comite
Margaret Ferron
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
jguglielmo@scott-scott.com
ecomite@scott-scott.com
mferron@scott-scott.com

Karen Sharp Halbert
William R. Olson
**ROBERTS LAW FIRM P.A.**
20 Rahling Circle
Little Rock, AR 72223
Telephone: (501) 821-5575
Facsimile: (501) 821-4474

karenhalbert@robertslawfirm.us
williamolson@robertslawfirm.us

Arthur M. Murray
Stephen B. Murray, Sr.
Caroline Thomas White
**MURRAY LAW FIRM**
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 525-8100
Facsimile: (504) 584-5249
amurray@murray-lawfirm.com
smurray@murray-lawfirm.com
cthomas@murray-lawfirm.com

*Executive Committee for Plaintiffs and the Class*